Opinion
KENNARD, J.
A jury found defendant Dewayne Michael Carey guilty of one count of first degree murder (Pen. Code, § 187, subd. (a))[1] with the special circumstances of murder in the commission of robbery and burglary (§ 190.2, subd. (a)(17)(A), (G)), one count of first degree residential robbery (§ 211), and one count of first degree burglary (§ 459). The jury further found that defendant personally used a deadly weapon, a knife, in the commission of the murder. (§ 12022, subd. (b).) Defendant waived a jury trial on prior conviction allegations, and the trial proceeded to the penalty phase, at which the jury returned a verdict of death.
The trial court found true the previously bifurcated allegations that defendant suffered a prior serious felony conviction within the meaning of section 667, subdivision (a)(1), that defendant served a prior prison term under section 667.5, subdivision (b), and that defendant fell within the provisions of section 1170.12, subdivisions (a)-(d) (the “Three Strikes” Law), and it denied defendant’s automatic application to modify the verdict (§ 190.4, subd. (e)). The court sentenced defendant to death for the murder and to a determinate term, stayed, on the noncapital counts and enhancements. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment.
I. Facts
On April 19, 1995, Billy Campbell found his wife, Ernestine, dead in the hallway of their home in Harbor City in Southern California. Ernestine’s *113 body was in an upright position at the bottom of the staircase; her hands were tied to the handrail. She had been stabbed to death, and many items of property had been stolen from the home. On the morning of the murder, defendant was seen leaving the Campbell home, and he was later connected to property stolen from the Campbells. After his arrest, defendant confessed to killing Ernestine Campbell.
A. Guilt Phase
1. Prosecution’s case
a. Ernestine Campbell’s murder
At 9:00 a.m. on April 19, 1995, the day of Ernestine Campbell’s murder, Bertram Ashe, who lived two houses away from Billy and Ernestine Campbell, was taking a walk in the neighborhood when he heard the front door to the Campbell residence open and close. He watched defendant walk from the Campbells’ porch toward the sidewalk. Defendant greeted Ashe and continued toward the house next door, where he lived with his aunt and uncle, Naomi and Herbert Baker, and their daughter Pamela.
That morning Ernestine Campbell attended a class at Los Angeles Harbor College from 9:00 a.m. until about 9:50 a.m. Around 10:30 a.m., Robert Lee Vaughn, a family friend, arrived at the Campbell residence to do maintenance work. When Vaughn knocked on the door, he heard Ernestine call out from inside, asking him to return in 30 minutes.
Just before 11:00 a.m., Vaughn saw defendant come out of the Bakers’ garage and walk to his yellow Ford pickup truck, which was parked on the street. Defendant started his truck and then, leaving the engine running, asked Vaughn for a ride to the gas station, explaining that he did not have enough gas to drive there himself. After a second knock on the Campbells’ door went unanswered, Vaughn agreed to drive defendant to the gas station.
Vaughn mentioned to defendant that Ernestine Campbell had not answered the door. At defendant’s suggestion, Vaughn telephoned the Campbell residence from a phone booth at the gas station; no one answered.
Sometime after 11:00 a.m., Jack Shaw, who lived across the street from the Campbells, was in his driveway working on his car, when he heard a scream; he was unsure from where it came and did not respond. Several minutes later, Shaw saw a yellow Ford pickup truck drive past his house; the driver waved as he drove past Shaw.
*114 After visiting the gas station, Vaughn returned to the Campbell residence. Vaughn knocked on both the front and side doors, but received no response. A few minutes later, he walked to Billy Campbell’s office and told him that the latter’s wife had not responded at the house. Billy Campbell telephoned home, but no one answered.
Campbell and Vaughn then drove to the Campbell residence, where Campbell discovered his wife’s body tied to the banister of the interior staircase. Campbell called 911, and he told a paramedic, “I think my wife has fallen on a knife and killed herself.” Vaughn testified that when he entered the hallway he saw Ernestine Campbell’s body sitting upright on the staircase with her hands tied to the handrail. After calling 911, Billy Campbell retrieved a small steak knife from the kitchen and cut his wife’s body down from the railing.
About 11:40 a.m., Los Angeles County Sheriffs Deputy Robert Stevens arrived at the Campbell home. Stevens searched the home and saw that the screen on the kitchen window had been partially removed. He also found blood on the stairs and on the blade of a kitchen knife that lay near Ernestine Campbell’s feet. A severed electrical cord was tied to the banister and a second, smaller knife lay at the top of the stairs.
When Los Angeles County Fire Department paramedics Brian Dallas Jones and Derrick Ho responded to the scene at 11:42 a.m., Ernestine’s body lay on the floor at the bottom of a stairway. In a vain effort to resuscitate her, Jones cut open Ernestine’s shirt, revealing stab wounds to her chest and neck. Ho saw a large kitchen knife next to Ernestine’s left hand and a second knife lying at the top of the stairs.
About 2:05 p.m., Los Angeles County Sheriffs Homicide Detective Byron Wisberger arrived at the Campbell residence. He saw a large butcher knife on the first step of the stairway, a cut electrical cord attached to the stairway handrail, and a second, smaller knife on one of the upper stairs. He also saw a single earring and a bracelet on the stairs. On the kitchen counter was an open purse, its contents scattered about the stove. In an upstairs bedroom, Wisberger found two other purses, their apparent contents strewn about the bed. All the doors were locked, except for a closed but unlocked sliding door leading to the patio. The kitchen window was also closed but unlocked, and its glass was smudged with handprints; the window screen was hanging loosely.
Los Angeles County Deputy Medical Examiner Solomon Riley testified that Ernestine Campbell died as a result of multiple stab wounds. Seven of the wounds were to the left side of her chest, penetrating the heart and left *115 lung. To the right side of the neck were two stab wounds, one of which was an inch deep and penetrated the thyroid gland. There were abrasions on the bridge of the nose and between the upper lip and nose. There also was bruising under the skin of the right wrist. Blood leaks from the victim’s eyes indicated a lack of blood supply to the brain, which could have resulted from suffocation or strangulation.
b. Defendant’s activities after the murder
Defendant’s friend Robert Leach testified that defendant arrived at his house around 11:30 a.m. or noon on April 19, 1995. Defendant was in good spirits and was better dressed than usual. Defendant asked Leach to help him remove some items from his truck, including a 12-gauge shotgun and a large Sparkletts water bottle containing change and paper money. They counted the money from the bottle, which totaled about $1,200. The two men then had dinner, after which defendant left Leach’s house. Defendant left behind the items from his truck, saying he would return the next day.
Detective Wisberger testified that, in an interview conducted about 8:45 p.m. on April 19, 1995, defendant mentioned getting a ride to the gas station with Vaughn and thereafter leaving home around 11:00 a.m. to visit his friend Leach. Defendant denied any knowledge of Ernestine Campbell’s murder. After the interview, Wisberger saw a full gasoline can in defendant’s truck.
That same evening between 11:00 and 11:30 p.m., defendant telephoned Leach and said the police had questioned him for two hours about a neighbor who had been killed earlier that day. After telling Leach that he had given the detectives Leach’s name, address, and telephone number, defendant asked Leach not to tell the police about the money or the gun that Leach had earlier helped remove from defendant’s truck.
The next day, Leach took the gun and some of the coins to his friend Christopher Floyd’s house and stored the items in Floyd’s garage. Leach told Floyd that the gun belonged to defendant. After leaving Floyd’s house, Leach encountered defendant on a nearby street. When Leach inquired about the money and the gun, defendant assured Leach they were “legit.”
Several days after the murder, Leach and two female companions exchanged some $780 worth of coins from the Sparkletts water bottle for paper currency. Defendant then picked up the money from Leach and gave him about $100.
On April 21, 1995, defendant came to the house of his former girlfriend Michele Leathers to visit their young daughter. According to Leathers, *116 defendant gave his daughter approximately twelve $2 bills; he gave her half sister one or two. Defendant told Leathers that he got the money “legally.” Leathers recalled that defendant appeared calm during the visit.
Defendant’s cousin Pamela Baker testified that, on April 22, 1995, defendant attended a family barbeque. Baker was surprised that defendant had bought meat for the barbeque because he usually did not have money, but she did not ask where defendant had gotten the money.
Defendant’s female friend Peggy Moseley testified that in the latter part of April, defendant took her to a park where he gave her a small bottle of cologne, a watch, a diamond pendant, and three $100 bills. A few days later, defendant gave Moseley five silver dollars and some loose change. Moseley described defendant as being “his normal self’ during this period.
On May 2, 1995, the police interviewed Leach, and he told them about concealing the shotgun and the money in the Sparkletts water bottle for defendant. He said that defendant had assured him the property was “legit.” Leach gave the detectives a bag of dimes and other property belonging to Billy Campbell and his murdered wife Ernestine, and he took the detectives to Floyd’s house, where they recovered the shotgun.
About 2:30 a.m. on May 3, 1995, defendant appeared at Peggy Moseley’s house “ranting and raving.” According to Moseley, defendant was very emotional and asked her to come outside to talk. She did so while her fiancé, Edward Moseley, called the police. Defendant said something had happened. According to Peggy Moseley, defendant was “babbling” but saying “nothing in particular.”
Peggy Moseley got into defendant’s car to talk to him and he started driving. Defendant drove to a hotel and got a room where they spent the night. Throughout the night, defendant repeatedly said he wanted to “go away” with Moseley. The next morning, he was not as agitated and they spent the day driving around. Defendant did not mention the murder.
Detective Wisberger testified that on May 4, 1995, he saw defendant’s truck parked across the street from the home of Kenneth Reedus, defendant’s cousin. Wisberger and his partner Detective Isaac Aguilar spoke to Reedus. During their conversation, Reedus received a telephone call from defendant. Aguilar spoke to defendant and they agreed to meet at the Baker residence at 8:00 p.m. The detectives waited until 9:15 p.m., but defendant did not arrive.
Leach testified that approximately two weeks after the murder, defendant showed him a gold bracelet with diamonds; he would not tell Leach where the bracelet came from.
*117 c. Defendant’s arrest and confession
After receiving information that defendant might be in Tustin, Orange County, Detective Wisberger contacted Tustin Police Officer Kenneth Maddox and asked him to be on the lookout for defendant. On May 7, 1995, Maddox found defendant and Peggy Moseley at a motel in Tustin. He arrested defendant and transported him and Moseley to the Tustin Police Department. There, police officers contacted Edward Moseley and told him to bring them Peggy Moseley’s purse. Found in the purse were jewelry and other items belonging to the Campbells.
That afternoon, Detectives Wisberger and Aguilar began interviewing defendant. After being advised of his rights under Miranda v. Arizona (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602], defendant denied any knowledge of, or involvement in, the murder. Defendant claimed that at the time of the murder he had been at home watching the O.J. Simpson trial on television. Wisberger knew there had been no coverage of the Simpson trial that day because of extensive coverage of the Oklahoma City bombing, which occurred the same day as Ernestine Campbell’s murder.
When defendant was told a witness had seen him outside the Campbell residence, he said that Leach had committed the burglary and murder, and that defendant had acted only as a lookout. Upon further questioning, defendant said, “Robert Leach had nothing to do with this.” Defendant explained, both in an unrecorded statement and in a later recorded version, that the night before the murder he formulated a plan to burglarize the Campbell home to obtain money for his friend Peggy Moseley. On the day of the murder, defendant approached the front door of the Campbells’ home and rang the doorbell to see if anybody was home. Nobody answered the door. Defendant then entered through the kitchen window and placed several items, including coins and jewelry, into a pillowcase. Defendant was upstairs when Ernestine Campbell came home; he walked down the stairs, armed with a shotgun he had found in the house.
Defendant and Ernestine Campbell spoke for about 10 or 15 minutes. She urged defendant to leave and said she would not tell defendant’s uncle or the police. Defendant did not believe her, however, and proceeded to tie her to the stair railing with an electrical cord. He then used a small knife to stab her several times in the neck and chest. These initial wounds were not fatal, and at one point Ernestine Campbell screamed. Defendant discarded the smaller knife in the kitchen sink and retrieved a larger knife with which he stabbed Ernestine three or four more times in the chest until he thought she was dead. Defendant left the knife in her chest, and continued burglarizing the home.
*118 Defendant threw the stolen property over the wall separating the Campbells’ home from that of the Bakers, with whom he lived, and hid it in the Bakers’ garage. After leaving the Bakers’ home, defendant noticed that Vaughn, the Campbells’ friend, was still in the neighborhood. He did not want Vaughn to discover Ernestine Campbell’s body right away, so he asked Vaughn to take him to the gas station.
After returning from the gas station, defendant retrieved the stolen property he had hidden in the Bakers’ garage and drove to his friend Leach’s house. Later that day, he gave some of the property to Peggy Moseley and hid the pillowcase filled with jewelry behind some bushes in an alley behind his mother’s house. Detective Aguilar later recovered the pillowcase from the alley.
The Campbells’ daughter, Helene Campbell, testified that various items of property had been taken from her parents’ home, including jewelry, a shotgun, and a five-gallon Sparkletts water bottle containing coins and bills. She identified various photographic exhibits of items recovered by police as depicting property belonging to her family.
d. Forensic evidence
Los Angeles County Deputy Sheriff Lauren Hernandez, a forensic identification specialist, testified that two fingerprints lifted from a white cardboard jewelry box taken as evidence matched defendant’s thumbprints.
e. Defendant’s jailhouse admissions
On May 8, 1995, the day after his arrest, defendant called his former girlfriend Michele Leathers from jail. She asked him how he could have killed an innocent lady. Defendant replied, “Yes, but that’s nor here or there.”
On June 27, 1995, defendant called his cousin Pamela Baker from jail. When Baker asked him why he had killed Ernestine Campbell, defendant said he needed quick money to fund Peggy Moseley’s illegal drug use.
2. Defense case
The defense presented no evidence at the guilt phase.
B. Prosecution’s Penalty Phase Case
1. Prior felony convictions
At the penalty phase, the prosecution presented evidence that defendant had two prior felony convictions (voluntary manslaughter and possession of a *119 weapon while in custody) as circumstances in aggravation. (§ 190.3, factor (c).) The pertinent facts are these:
On July 3, 1985, Jose Hernandez was living on St. Andrews Place in Los Angeles. That day, Hernandez, his brother-in-law Juan Ramos and his nephew were pushing Hernandez’s car, which had a flat tire, into a parking space in front of the apartment building where defendant happened to be sitting. This upset defendant, who started shoving Ramos, striking him several times. Ramos yelled for help and three or four friends, including Eli Martinez, responded. The men began fighting and Martinez attempted to break up the fight.
After the fight ended, defendant went into the apartment building and returned with a gun. He approached Martinez and shot him in the chest.
The next day, Los Angeles Police Detective Frank Bishop went to defendant’s apartment to arrest him. Defendant attempted to flee but was apprehended by another officer. Defendant told the police that he, his mother, his aunt and several friends were drinking outside the apartment building when three or four Hispanic men moved a car to a space in front of the building. Defendant did not want the car there and an argument ensued. Defendant hit one of the men in the nose; in turn the man hit defendant and whistled for help. The man’s friends arrived, and the fight escalated. Defendant said that the other men pulled out knives, chains, and sticks. Defendant then got a gun from his apartment to protect his mother. When he returned, Martinez walked toward him quickly with something in his hand and said, “Shoot me. Shoot me.” Defendant shot Martinez in the chest from about five or six feet away. Defendant said Martinez got what he asked for.
The medical examiner concluded that Martinez died from a gunshot wound to the chest. The presence of gunpowder stippling on Martinez’s left arm suggested that the gun was fired from a distance of no more than 12 to 18 inches.
Defendant was arrested for the murder of Martinez, but he ultimately pleaded guilty to voluntary manslaughter (§ 192), in exchange for a sentence of 13 years in state prison.
Defendant’s second felony conviction resulted from a crime committed while he was serving that sentence.
On March 5, 1987, correctional officers at Folsom State Prison searched a cell shared by defendant and another inmate. The officers found a metal *120 weapon measuring nine and three-quarter inches long and one and three-quarter inches wide, which had been sharpened to a point. Defendant admitted ownership of the weapon and was convicted of possession of a weapon while in custody (§ 4502). He was sentenced to an additional two-year prison term.
2. Prior uncharged acts
The prosecution presented evidence of three criminal acts committed by defendant involving the use, or attempted use, of force or violence. (§ 190.3, factor (b).)
Norman Hughes testified at defendant’s trial that on May 29, 1979, defendant was at Hughes’s house drinking beer when Hughes asked defendant to leave. Somewhat later that night, a “boulder” was thrown through Hughes’s window. The next night, another “boulder” came through the window, and Hughes saw defendant fleeing the area. Hughes and his brother Darryl gave chase, eventually joined by their friend, Kenneth Merritt. When defendant emerged from a nearby apartment building, they grabbed him. While Merritt left to summon the police, two or three of defendant’s friends then came out of the apartment building and began circling the Hughes brothers. One of the men handed defendant a pocketknife. He approached Norman Hughes, making a slashing motion with the knife. When police arrived, they arrested defendant and retrieved the knife.
The second incident occurred January 26, 1988, when Johnny Westbrook, an inmate at Folsom State Prison, was stabbed in the neck by defendant while in the exercise yard. An inmate-manufactured weapon was found at the scene.
The third incident involved the September 15, 1989 stabbing of inmate David Snidow at Folsom State Prison. After the attack, a prison-made weapon flecked with blood was found lying next to Snidow. Correctional officers searched the area and found additional weapons.
Correctional Officer Robert Buda testified at defendant’s capital trial that he interviewed inmate Riley Jones after the incident. Jones provided information that prompted Officer Buda to search the cell shared by defendant and another inmate. Officer Buda found evidence that weapons had been manufactured in the cell.
Jones testified at defendant’s trial that he and defendant were in the same Black prison gang and that they planned to kill Snidow because he was White and in a rival gang. Defendant and another inmate manufactured the weapons, and defendant brought three knives into the work center. Jones distracted *121 Snidow so defendant and a fellow inmate could attack him. The men stabbed Snidow at least seven or eight times.
An administrative charge of conspiracy to commit assault was lodged against defendant, but the charge was dismissed for insufficient evidence because inmate Jones refused to implicate defendant.[2]
Michele Leathers testified that when defendant telephoned her from jail on the day he was arrested for Ernestine Campbell’s murder, he admitted having “stabbed many people” while in prison. Defendant did not answer when she asked if any of those individuals died.
3. Victim impact testimony
Helene Campbell testified that her mother had devoted her life to the betterment of herself and others. At the age of eight her mother went to work in the fields of Brookhaven, Mississippi, to help support the family. After high school, she moved to California to attend nursing school, and in 1963 she married Billy Campbell. She completed her full-time studies while continuing to work part time and raise her two children.
Ernestine Campbell became a licensed vocational nurse, then a physician’s assistant, and later a substance abuse counselor. When the family began experiencing financial difficulties, she worked two jobs to earn additional income.
Ernestine Campbell volunteered her time and energy to help others, even cooking for defendant’s aunt and uncle after the aunt had a nervous breakdown.
In 1994, Ernestine Campbell was injured in an automobile accident. She underwent brain surgery, which left her unable to return to work. She returned to school, taking a business course so she could help her husband at his office. It was this class that she was attending when defendant broke into her home.
Dr. Juanita Watts-Strozier testified that when she became a staff physician at Kaiser Permanente Hospital in Inglewood in 1984, she met Ernestine *122 Campbell. Over a 12-year period, the two became close friends, and she and her family were devastated by Ernestine Campbell’s death.
C. Defense’s Penalty Phase Case in Mitigation
In mitigation, the defense presented evidence of defendant’s emotional and physical abuse as a child.
John Carey, defendant’s father, testified that defendant was bom in Atchison, Kansas, on March 21, 1960. He was the oldest of three children. The family moved often, and by the time defendant started school they were living in New Haven, Connecticut. From the time defendant was an infant, John punished him by hitting him with his hand or with a belt.
When defendant was about 10 years old, the family moved to California. Several months later defendant’s parents divorced, and his father returned to Kansas. After living with their mother for a year, the children joined their father in Kansas. Defendant’s stepmother beat him and his brother. Once a neighbor heard the boys’ screams and called the police.
Meanwhile defendant’s mother had become an alcoholic. After an argument with his stepmother when defendant was 15 years old, he returned to California to live with his mother.
Defendant’s cousin, Shirley Reedus, testified that she often saw defendant while they were in grammar school in California. Defendant had no problems in school at that time. Once Reedus saw defendant’s father beat him.
Defense investigator Richard Fox testified that when he interviewed Norman Hughes about the 1979 stone-throwing incident, Hughes told him that defendant had threatened him with either a large stick or a pipe, not a knife.
Perry Scranton, a longtime friend of defendant’s, testified he was present on July 3, 1985, when defendant shot Eli Martinez after an argument about parking a car in front of defendant’s apartment building. One of the Hispanic men whistled and in response 10 to 15 Hispanics armed with sticks, chains, knives, and bottles appeared “out of nowhere.” Defendant left to retrieve a gun. One of the Hispanic men was holding a metal pipe. The man yelled, “Kill me. Kill me.” He drew back as if getting ready to strike defendant, who then shot him.
Albert Colquitt was defendant’s cabinetry instructor while defendant was incarcerated at Calipatria State Prison in 1992. Colquitt described defendant as an excellent student and a role model for other prisoners.
*123 II. Exclusion of Juror for Cause
Defendant contends that by excusing Prospective Juror S.M. for cause, based on her opposition to the death penalty, the trial court violated defendant’s federal and state constitutional rights to an impartial jury, a fair capital sentencing hearing, and due process of law.[3]
In her responses to the jury questionnaire, S.M. indicated that she held moral or philosophical beliefs preventing her from imposing the death penalty. She also wrote that she could not personally participate in a decision that would result in the execution of defendant. These answers prompted the trial court to question S.M. further during voir dire. At that time, S.M. said she could impose the death penalty only in a case of multiple murder. The trial court then asked her if she would be able to impose the death penalty if a defendant was convicted of first degree murder with a robbery or a burglary special circumstance; S.M. responded, “I still don’t believe in [the] death penalty, sir.” Defense counsel then questioned her:
Defense counsel: “Now, let me ask you this, ma’am: If you heard evidence . . . that the person charged with the murder in this case, or any case, would have previously been convicted of killing someone, do you think that’s a situation in which you might be able to give the death penalty?”
S.M.: “Yes, sir.”
Defense counsel: “You could give the death penalty in that situation?”
S.M.: “Yes, sir. Because it has been done before. And, you know, I still don’t want the convicted person to commit another murder, you know.”
Defense counsel: “So are you saying then that maybe—even though you think a person, in the situation I’ve outlined, perhaps should get the death penalty, that you couldn’t—if you were a juror in this case, you couldn’t vote for the death penalty, even under that situation?”
*124 S.M.: “I don’t understand, sir.”
Defense counsel; “Well, I—again, going to the situation where a person who is charged in the case was convicted by the jury of murder, and you subsequently learned that that person had previously killed someone, is that a person that you could personally vote to give the death penalty, or is your feeling still, no matter what the facts were, that you could never vote for the death penalty?”
S.M.: “Well, it really depends on a situation. If, before he—just like I said before, if it was multiple murders, you know. Not unless it’s multiple murders, I could probably vote for death penalty.”
In an attempt to clarify that response by S.M., the trial court asked her whether she could impose the death penalty if she “were convinced that the evidence established [defendant’s] guilt [of murder] beyond a reasonable doubt and that the special circumstance, the robbery or the burglary, was true, . . . without knowing any more.” S.M. replied that she was confused by the questioning. The trial court made another attempt at clarification.
The court: “. . . You’ve told us that if this were a case where Mr. Carey was charged with multiple murders—”
S.M.: “Yes.”
The court: “—and he were to have been found to have committed those murders, and they were murders in the first degree, that you might be able to impose the death penalty or vote for the death penalty. Right?”
S.M.: “Yes, sir.”
The court: “Okay.
“Well, how about a case where he’s not charged with multiple murders, but he is convicted of the murder, and it’s a first degree, and you’re convinced it was during a robbery or a burglary, and you find that to be true. Now you get in the penalty phase, and you find that some time in the past, not in this same case, that he was convicted of another killing of some kind. Not in this case.” (Italics added.)
S.M.: “Um-hmm.”
The court: “Could you vote for a death penalty in that situation?” (Italics added.)
*125 S.M.: “No, sir.” (Italics added.)
The trial court then excused Prospective Juror S.M. for cause.
A trial court may excuse for cause a prospective juror who on voir dire expresses views about capital punishment, either for or against, that “would ‘prevent or substantially impair’ the performance of the juror’s duties as defined by the court’s instructions and the juror’s oath.” (People v. Crittenden (1994) 9 Cal.4th 83, 121 [36 Cal.Rptr.2d 474, 885 P.2d 887], quoting Wainwright v. Witt, supra, 469 U.S. at p. 424; see also People v. Bolden (2002) 29 Cal.4th 515, 536-537 [127 Cal.Rptr.2d 802, 58 P.3d 931].) “A challenge for cause may be based on the juror’s response when informed of facts or circumstances likely to be present in the case being tried.” (People v. Cash (2002) 28 Cal.4th 703, 720 [122 Cal.Rptr.2d 545, 50 P.3d 332], citing People v. Kirkpatrick (1994) 7 Cal.4th 988, 1005 [30 Cal.Rptr.2d 818, 874 P.2d 248].) The determinative question is whether the juror’s views on the death penalty “ ‘ “ ‘ “would prevent or impair the juror’s ability to return a verdict of death in the case before the juror.” ’ ” ’ ” (Cash, at p. 720, quoting People v. Ochoa (2001) 26 Cal.4th 398, 431 [110 Cal.Rptr.2d 324, 28 P.3d 78].)
A reviewing court will uphold a trial court’s ruling on a challenge for cause by either party “ ‘if it is fairly supported by the record, accepting as binding the trial court’s determination as to the prospective juror’s true state of mind when the prospective juror has made statements that are conflicting or ambiguous.’ ” (People v. Blair (2005) 36 Cal.4th 686, 743 [31 Cal.Rptr.3d 485, 115 P.3d 1145], quoting People v. Jenkins (2000) 22 Cal.4th 900, 987 [95 Cal.Rptr.2d 377, 997 P.2d 1044].) Having observed the juror during voir dire, the trial court is in the best position to assess the juror’s state of mind. (See People v. Moon (2005) 37 Cal.4th 1, 14 [32 Cal.Rptr.3d 894, 117 P.3d 591].)
Here, Prospective Juror S.M., both in her questionnaire and during voir dire, expressed her opposition to the death penalty, except in a case of multiple murders. In her answer to the trial court’s final question, S.M. said, in no uncertain terms, that she would not vote for death in a case such as this, which involved a single murder. (People v. Cash, supra, 28 Cal.4th at p. 720.) Thus, the trial court properly excused her for cause. (People v. Crittenden, supra, 9 Cal.4th at p. 121.) To the extent her earlier answer to defense counsel indicated her ability to impose the death penalty on the facts of this case, it conflicts with her final response, made to the question posed by the trial court. Under such circumstances, we accept the trial court’s implied determination that Prospective Juror S.M.’s views on the death penalty would have prevented or substantially impaired her performance of the duties required of a juror in a capital case. (People v. Bolden, supra, 29 Cal.4th at p. 537.)
*126 III. Issues Relating to Guilt
The prosecutor advanced two theories of defendant’s guilt: one was felony murder (the murder was committed in the course of burglarizing the Campbells’ home or robbing Ernestine Campbell of her jewelry), the other was premeditated and deliberated murder.
A. Admission of Autopsy Photographs
1. Background
Defendant faults the trial court for admitting, over his objection, autopsy photographs depicting the victim’s wounds. He contends the photographs were irrelevant and were more prejudicial than probative. (See Evid. Code, § 352.) Defendant also argues the trial court failed to make an affirmative showing that it had weighed prejudicial impact against probative value. Finally, defendant asserts the trial court’s error in admitting the photographs violated his rights to due process, a fair jury trial and a reliable capital trial under both the state and federal Constitutions.
At trial, defendant did not raise a relevance objection to the admission of the photographs. Therefore, he has forfeited any such claim on appeal. (People v. Clark (1992) 3 Cal.4th 41, 125-126 [10 Cal.Rptr.2d 554, 833 P.2d 561] [“In the absence of a timely and specific objection on the ground sought to be urged on appeal, the trial court’s rulings on admissibility of evidence will not be reviewed”]; cf. People v. Barnett (1998) 17 Cal.4th 1044, 1130 [74 Cal.Rptr.2d 121, 954 P.2d 384] [relevance objection does not preserve a challenge under Evid. Code, § 352].) Even if properly before us, defendant’s argument lacks merit.[4]
*127 The prosecutor first sought to admit People’s exhibits 9 and 10. Exhibit 9, an autopsy photograph depicting the murder victim’s chest, shows five lacerations with some closed by sutures. Exhibit 10, an autopsy photograph depicting the victim’s neck and upper chest, shows two cuts on the right side of her neck and one of the chest wounds shown in exhibit 9. The prosecutor argued that the photographs were relevant to show the location of the injuries, to illustrate paramedic Derrick Ho’s testimony about the nature of the victim’s wounds, and that they were probative of whether defendant had acted with malice. Defense counsel objected, asserting the photographs were inflammatory, but the trial court overruled the objection.
The prosecutor later sought to admit exhibit 15, a photo board displaying nine separate autopsy photographs. Each of the photographs depicted portions of the murder victim’s body that had stab wounds. Specifically, photograph 15-G was a graphic image of the victim’s rib cage with the skin removed. The prosecutor argued that the depth of the stab wound depicted in the photographs supported an inference of malice on the part of the killer.
Defense counsel objected to the admission of the photographs, particularly photograph 15-G, asserting their inflammatory nature.[5] The trial court admitted eight of the nine photographs but excluded photograph 15-G, finding that it was not sufficiently probative of malice to outweigh its highly inflammatory nature.
2. Relevance
Autopsy photographs of a murder victim are always relevant at trial to prove how the crime occurred; the prosecution need not prove these details solely through witness testimony. (People v. Pollock (2004) 32 Cal.4th 1153, 1170 [13 Cal.Rptr.3d 34, 89 P.3d 353]; see also People v. Turner (1990) 50 Cal.3d 668, 706 [268 Cal.Rptr. 706, 789 P.2d 887].) Such photographs may also be relevant to prove that the killer acted with malice. (People v. Clair (1992) 2 Cal.4th 629, 660 [7 Cal.Rptr.2d 564, 828 P.2d 705].) Here, the *128 prosecutor offered exhibits 9, 10, and 15 to prove how the crime occurred, by showing the location of the wounds and to illustrate the paramedic’s testimony. The prosecutor also offered the photographs to prove malice, based on an alternate theory of first degree murder. The autopsy photographs were therefore relevant (People v. Pollock, supra, at p. 1170), and their relevance is not lessened, contrary to defendant’s argument, because the cause of death was undisputed. (People v. Stitely (2005) 35 Cal.4th 514, 545 [26 Cal.Rptr.3d 1, 108 P.3d 182]; see also People v. Lewis (2001) 25 Cal.4th 610, 641 [106 Cal.Rptr.2d 629, 22 P.3d 392].)
3. Evidence Code section 352
Defendant complains that the autopsy photographs were more prejudicial than probative, and therefore should not have been admitted under Evidence Code section 352. We review a trial court’s ruling under section 352 for abuse of discretion. (People v. Lucas (1995) 12 Cal.4th 415, 449 [48 Cal.Rptr.2d 525, 907 P.2d 373].) On appeal, a trial court’s exercise of discretion to admit evidence under that evidentiary statute is reversed only if “the probative value of the photographs clearly is outweighed by their prejudicial effect.” (People v. Crittenden, supra, 9 Cal.4th at p. 134, citing People v. Wilson (1992) 3 Cal.4th 926, 938 [13 Cal.Rptr.2d 259, 838 P.2d 1212].) Prejudicial in this context is “evidence that uniquely tends to evoke an emotional bias against a party as an individual” and has only slight probative value. (Crittenden, at p. 134.)
We have reviewed the photographs in question. Although autopsy photographs of a murder victim are always unpleasant, the photographs in this case are not overly graphic and are relevant to the manner in which Ernestine Campbell was killed. (See People v. Hinton (2006) 37 Cal.4th 839, 896 [38 Cal.Rptr.3d 149, 126 P.3d 981] [photos showing where bullets entered victims’ bodies were probative and neither gruesome nor offensive].) Because the probative value of the autopsy photographs that were admitted into evidence in exhibits 9, 10, and 15 was not clearly outweighed by their prejudicial effect, the trial court did not abuse its discretion.
Contrary to defendant’s contention, the trial court did weigh the photographs’ prejudicial effect against their probative value. Although the trial court did not expressly describe that weighing process with respect to exhibits 9 and 10, the record shows that the court heard defense counsel argue that each photograph was prejudicial, and the court indicated awareness of its duty to conduct the weighing process required by Evidence Code section 352. (People v. Crittenden, supra, 9 Cal.4th at p. 135.) As to exhibit 15, which included multiple photographs, the trial court expressly stated it was excluding photograph “15-G” because the prejudicial effect of that image outweighed its probative value.
*129 Nor were the photographs inadmissible as cumulative of witness testimony (People v. Price (1991) 1 Cal.4th 324, 441 [3 Cal.Rptr.2d 106, 821 P.2d 610]), or of other photographs (People v. Cole (2004) 33 Cal.4th 1158, 1199 [17 Cal.Rptr.3d 532, 95 P.3d 811]).
Because the autopsy photographs of the murder victim were properly admitted into evidence at the guilt phase, defendant’s claim that the photographs improperly influenced the penalty phase necessarily fails.
B. Jury Instructions
1. Instructions assertedly undermining the reasonable doubt standard
Defendant contends that several standard jury instructions drawn from CALJIC (5th ed. 1988) and given here lowered the requisite standard of proof beyond a reasonable doubt. He cites specifically those instructions pertaining to (1) circumstantial evidence (CALJIC Nos. 2.02 [sufficiency of circumstantial evidence to prove specific intent or mental state], 8.83 [sufficiency of circumstantial evidence to prove a special circumstance], and 8.83.1 [sufficiency of circumstantial evidence to prove mental state]); and (2) witness credibility and weight of the evidence (CALJIC Nos. 1.00 [respective duties of judge and jury], 2.21.1 [discrepancies in testimony], 2.21.2 [witness willfully false], 2.22 [weighing conflicting testimony], 2.27 [sufficiency of testimony of one witness], and 2.51 [motive]).
At trial, defendant did not object to these instructions. Notwithstanding his failure to do so, defendant’s claim is cognizable on appeal to the extent it implicates his substantial rights. (§ 1259; see People v. Gray (2005) 37 Cal.4th 168, 235 [33 Cal.Rptr.3d 451, 118 P.3d 496] [notwithstanding a failure to object at trial, a defendant may raise on appeal an instructional error claim that affects his substantial rights].)
Defendant initially argues that CALJIC Nos. 2.02, 8.83, and 8.83.1 (1) misled the jury into believing it could convict defendant if he “reasonably appeared” to be guilty, even if it entertained a reasonable doubt as to his guilt, and (2) implied that defendant was required to present, at the very least, a “reasonable” defense to the prosecution’s case. He complains specifically of language common to all three instructions stating that if one interpretation of the evidence “appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable.” As defendant concedes, we have in the past rejected similar arguments. (People v. Hughes (2002) 27 Cal.4th 287 [116 Cal.Rptr.2d 401, 39 P.3d 432]; People v. Maury (2003) 30 Cal.4th 342, 428 [133 Cal.Rptr.2d *130 561, 68 P.3d 1]; People v. Crew (2003) 31 Cal.4th 822, 847 [3 Cal.Rptr.3d 733, 74 P.3d 820].) We see no reason to reconsider these decisions.
Defendant contends, however, that none of these cited cases considered “the possibility that the jurors might indeed apply the instructions in conjunction with CALJIC No. 2.90 (telling the jury that the defendant ‘is presumed to be innocent’ and that the prosecution bears ‘the burden of proving [him] guilty beyond a reasonable doubt’), and in the context of the jury instructions as a whole, and yet still be misled.” Defendant appears to suggest that the jury, even though properly instructed, might still have been confused about the requisite standard of proof. We reject that argument. “ ‘Jurors are presumed to be intelligent, capable of understanding instructions and applying them to the facts of the case.’ ” (People v. Lewis (2001) 26 Cal.4th 334, 390 [110 Cal.Rptr.2d 272, 28 P.3d 34]; see also People v. Welch (1999) 20 Cal.4th 701, 771 [85 Cal.Rptr.2d 203, 976 P.2d 754].) Moreover, we have in the past rejected the claim that CALJIC Nos. 2.02 and 2.90, when given together, erode the reasonable doubt standard of proof. (People v. Cook (2006) 39 Cal.4th 566, 601 [47 Cal.Rptr.3d 22, 139 P.3d 492]; People v. Navarette (2003) 30 Cal.4th 458, 501 [133 Cal.Rptr.2d 89, 66 P.3d 1182].)
Defendant next argues that CALJIC Nos. 1.00 and 2.51 misinformed the jury that its duty was merely to decide whether defendant was guilty or innocent, rather than whether he was guilty or not guilty beyond a reasonable doubt. We have in the past rejected this argument. (People v. Crew, supra, 31 Cal.4th at pp. 847-848; see People v. Nakahara (2003) 30 Cal.4th 705, 714 [134 Cal.Rptr.2d 223, 68 P.3d 1190].)
Pointing to CALJIC Nos. 2.21.1 and 2.21.2, defendant claims that these instructions lessened the burden of proof. CALJIC No. 2.21.1 bears on discrepancies within and between the testimony of witnesses, stating that two people will often see or hear the same event differently, an assertion we have characterized as a “fact” of common experience. (People v. Fudge (1994) 7 Cal.4th 1075, 1111 [31 Cal.Rptr.2d 321, 875 P.2d 36]; see Judicial Council of Cal. Grim. Jury Instns. (2006) CALCRIM No. 105 [“Do not automatically reject testimony just because of inconsistencies or conflicts. . . . People sometimes honestly forget things or make mistakes about what they remember. Also, two people may witness the same event yet see or hear it differently.”].) Defendant does not persuade us that CALJIC No. 2.21.1, dilutes the burden of proof beyond a reasonable doubt. CALJIC No. 2.21.2 allows the jury to reject the testimony of a witness “willfully false in one material part of his or her testimony” unless “from all the evidence, you believe the probability of truth favors his or her testimony in other particulars.” We have in the past rejected the contention that CALJIC No. 2.21.2 *131 lowers the beyond-a-reasonable-doubt burden of proof. (People v. Crew, supra, 31 Cal.4th at p. 848.) Defendant offers no reason to reconsider that decision.
Defendant also contends that CALJIC No. 2.22 effectively replaced the beyond-a-reasonable-doubt burden of proof with the lesser preponderance-of-the-evidence burden of proof in directing the jury to determine each factual issue in the case by deciding which witnesses were most convincing, regardless of the number of witnesses who testified to a particular version of events. Again, we previously have rejected this argument. (People v. Maury, supra, 30 Cal.4th at pp. 428-429.)
Finally, defendant argues that CALJIC No. 2.27 erroneously suggested to the jury that both the prosecution and the defense had a burden to prove facts. As defendant acknowledges, we have rejected this claim in our previous decisions. (People v. Rogers (2006) 39 Cal.4th 826, 889 [48 Cal.Rptr.3d 1, 141 P.3d 135]; People v. Noguera (1992) 4 Cal.4th 599, 633-634 [15 Cal.Rptr.2d 400, 842 P.2d 1160].)
Defendant offers no persuasive reason why this court should reconsider its prior decisions rejecting the claims of instructional error raised.
2. Variance between information and jury instruction
Defendant asserts the trial court erred in instructing the jury on first degree premeditated murder and first degree felony murder because the information charged defendant only with malice murder under section 187, and not with felony murder under section 189. In defendant’s view, by citing to subdivision (a) of section 187, which defines murder as “the unlawful killing of a human being, or a fetus, with malice aforethought,” the information at most charged him with malice murder in the second degree. Defendant contends that by so instructing the jury, the trial court exceeded its jurisdiction and violated defendant’s constitutional rights to due process, to notice of the charged crime, and to trial by jury (U.S. Const., 5th, 6th & 14th Amends.; Cal. Const., art. I, §§ 7, 15 & 16) as well as his right to a fair and reliable capital guilt trial (U.S. Const., 14th Amend.; Cal. Const., art. I, § 17). Defendant argues that our decision in People v. Dillon (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697], which he asserts held that felony murder and premeditated murder are separate crimes, implicitly overruled our decision in People v. Witt (1915) 170 Cal. 104, 107-108 [148 P. 928], that a defendant may be convicted of felony murder even though the information charged only murder with malice. We cannot agree.
*132 Although defendant did not object at trial to the first degree murder instructions, he has not forfeited his claim. (§ 1259 [appellate court may review refusal to issue instruction despite defendant’s failure to object at trial if defendant’s substantial rights were affected thereby]; People v. Williams (1999) 21 Cal.4th 335, 340 [87 Cal.Rptr.2d 412, 981 P.2d 42] [challenge to jurisdiction may be raised for the first time on appeal].)
Since deciding People v. Dillon, supra, 34 Cal.3d 441, we have reaffirmed our holding in People v. Witt, supra, 170 Cal. at pages 107-108, in a number of decisions. (E.g., People v. Anderson (2002) 28 Cal.4th 767, 776 [122 Cal.Rptr.2d 587, 50 P.3d 368]; People v. Nakahara, supra, 30 Cal.4th at p. 712.) We have held that when an accusatory pleading charges “murder, without specifying the degree,” it will be sufficient to charge murder in any degree. (People v. Anderson, supra, at p. 776.) In addition, we have held that felony murder and premeditated murder are not separate crimes, but rather different varieties of the same crime. (People v. Valdez (2004) 32 Cal.4th 73, 114, fn. 17 [8 Cal.Rptr.3d 271, 82 P.3d 296]; People v. Silva (2001) 25 Cal.4th 345, 367 [106 Cal.Rptr.2d 93, 21 P.3d 769].) Moreover, we have in the past rejected the jurisdictional argument now raised by defendant. (People v. Hughes, supra, 27 Cal.4th at pp. 369-370.) We have held that in instructing a jury on first degree murder when the information charged malice murder under section 187, a trial court does not violate a defendant’s federal constitutional rights to due process, notice, proof beyond a reasonable doubt, or a unanimous verdict. (Hughes, at pp. 369-370.) Here the information charged both a burglary and a robbery special circumstance, putting defendant on notice that the prosecution was proceeding on a felony-murder theory. (See People v. Williams (2006) 40 Cal.4th 287, 305 [52 Cal.Rptr.3d 268, 148 P.3d 47] [evidence in aggravation of premeditation and deliberation in the circumstances of a murder is not subject to notice requirement of § 190.3, and therefore absence of notice does not deny due process]; People v. Nakahara, supra, 30 Cal.4th at p. 712 [felony murder and premeditated murder need not be separately pleaded].) Defendant presents no persuasive reason to reconsider those previous holdings.
3. Jury unanimity
Defendant faults the trial court for not instructing the jury that it must unanimously agree whether defendant was guilty of premeditated murder or felony murder. Defendant claims that this error violated his rights under sections 7, 15, 16, and 17 of article I of the California Constitution, as well as the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution.
We repeatedly have held that jurors need not unanimously agree on a theory of first degree murder as either felony murder or murder with *133 premeditation. (People v. Nakahara, supra, 30 Cal.4th at p. 712; People v. Kipp (2001) 26 Cal.4th 1100, 1132 [113 Cal.Rptr.2d 27, 33 P.3d 450].) We have also concluded that neither Ring v. Arizona (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], nor Apprendi v. New Jersey (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], requires a different result. (People v. Nakahara, supra, at p. 713.) Accordingly, defendant’s claim fails.
IV. Issues Relating to Penalty
A. Trial Court’s Rejection of Proposed Instructions
Defendant faults the trial court for rejecting three penalty phase instructions the defense had proposed. As a result, defendant argues, he was deprived of the rights enunciated in People v. Rincon-Pineda (1975) 14 Cal.3d 864, 885 [123 Cal.Rptr. 119, 538 P.2d 247], and in People v. Sears (1970) 2 Cal.3d 180, 190 [84 Cal.Rptr. 711, 465 P.2d 847], and of his state and federal constitutional rights to a jury trial and a fair penalty determination.
Defendant refers first to a defense-proposed jury instruction stating that the absence of a statutory mitigating factor does not constitute an aggravating factor. The proposed instruction read: “Only those factors which are applicable on the evidence adduced at trial are to be taken into account in the penalty determination. All factors may not be relevant and a factor which is not relevant to the evidence in a particular case should be disregarded. The absence of a statutory mitigating factor does not constitute an aggravating factor.”
As we have held in the past, it is not error for a trial court not to give a jury instruction that a lack of mitigating evidence does not constitute aggravation. (People v. Hinton, supra, 37 Cal.4th at p. 912; People v. Cunningham (2001) 25 Cal.4th 926, 1041 [108 Cal.Rptr.2d 291, 25 P.3d 519].)
It was not error for the trial court to refuse the instruction even though the court instructed the jury, under another defense-drafted instruction, that: “The factors in the above list which you determine to be aggravating circumstances are the only ones which the law permits you to consider. You are not allowed to consider any other factors or circumstances as the basis for deciding that the death penalty would be an appropriate punishment in this case.” Although we have suggested that a trial court should instruct the jury that the absence of mitigating evidence does not constitute aggravating evidence when the court or parties improperly suggest the contrary (People v. Livaditis (1992) 2 Cal.4th 759, 784 [9 Cal.Rptr.2d 72, 831 P.2d 297] [“a specific instruction to that effect is not required, at least not unless the court or parties make an *134 improper contrary suggestion”]), the defense instruction given the jury here did not suggest a contrary rule. The instruction given, along with CALJIC No. 8.88, correctly told the jury of its discretion in deciding which of the statutory sentencing factors were applicable to the facts of defendant’s case. “A jury properly advised about the broad scope of its sentencing discretion is unlikely to conclude that the absence of [mitigating] factors ... is entitled to significant aggravating weight.” (People v. Melton (1988) 44 Cal.3d 713, 769 [244 Cal.Rptr. 867, 750 P.2d 741].)
The other jury instruction proposed by the defense and refused by the trial court read: “Evidence has been introduced for the purpose of showing the specific harm caused by the defendant’s crime. Such evidence, if believed, was not received and may not be considered by you to divert your attention from your proper role of deciding whether defendant should live or die. You must face this obligation soberly and rationally, and you may not impose the ultimate sanction as a result of an irrational, purely subjective response to emotional evidence and argument. On the other hand, evidence and argument on emotional though relevant subjects may provide legitimate reasons to sway the jury to show mercy.”
We have in the past rejected the argument that a trial court must instruct the jury not to be influenced by emotion resulting from victim impact evidence. (People v. Griffin (2004) 33 Cal.4th 536, 591 [15 Cal.Rptr.3d 743, 93 P.3d 344] [trial court need not give duplicative instructions]; People v. Ochoa, supra, 26 Cal.4th at p. 455 [proposed instruction that jury may not impose death penalty as a result of an irrational, subjective response to emotional evidence is duplicative of CALJIC No. 8.84.1].) Moreover, in People v. Harris (2005) 37 Cal.4th 310, 358 [33 Cal.Rptr.3d 509, 118 P.3d 545], we upheld the rejection of a jury instruction identical to the one proposed by defendant here. In Harris, the trial court concluded the instruction was confusing because it cautioned the jury against a subjective response to emotional evidence and argument without specifying whether the subjective reaction was that of the victim’s family or that of the jurors themselves. (Id. at p. 359.) The trial court here also expressed “concerns” about the propriety of the proposed instruction before rejecting it, although the court never articulated on the record what its concerns were.
Finally, defendant faults the trial court for rejecting the following proposed jury instruction: “The permissible aggravating factors are limited to those aggravating factors upon which you have been specifically instructed. Therefore, the defendant’s background may only be considered by you as mitigating evidence.”
*135 We have in the past upheld the refusal to give materially indistinguishable instructions. (People v. Hinton, supra, 37 Cal.4th at p. 912; People v. Ochoa, supra, 26 Cal.4th at p. 457.) A defendant’s criminal history, which is part of his background, may be considered in aggravation. (§ 190.3, factors (b), (c).)
In sum, the trial court here did not err in rejecting the above discussed jury instructions that defendant requested at the penalty phase.
B. Constitutionality of California’s Death Penalty Law
Defendant presents a number of arguments that California’s death penalty statute is unconstitutional. As defendant acknowledges, we have in the past rejected these arguments, and he presents no compelling reason for us to reconsider those holdings. Below we briefly describe those previous holdings.
Defendant contends that California’s imposition of the death penalty violates international norms and therefore constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments to the federal Constitution. “International law does not prohibit a sentence of death rendered in accordance with state and federal constitutional and statutory requirements.” (People v. Hillhouse (2002) 27 Cal.4th 469, 511 [117 Cal.Rptr.2d 45, 40 P.3d 754].) Defendant’s claim that the death penalty is imposed regularly as a form of punishment in this state “is a variation on the familiar argument that California’s death penalty law does not sufficiently narrow the class of death-eligible defendants to limit that class to the most serious offenders, a contention we have rejected in numerous decisions.” (People v. Perry (2006) 38 Cal.4th 302, 322 [42 Cal.Rptr.3d 30, 132 P.3d 235]; see People v. Bell (2007) 40 Cal.4th 582, 621 [54 Cal.Rptr.3d 453, 151 P.3d 292]; People v. Demetrulias (2006) 39 Cal.4th 1, 43-44 [45 Cal.Rptr.3d 407, 137 P.3d 229].)
Allowing the jury to consider the circumstances of the crime under section 190.3, factor (a) does not lead to the arbitrary and capricious imposition of the death penalty. (People v. Guerra (2006) 37 Cal.4th 1067, 1165 [40 Cal.Rptr.3d 118, 129 P.3d 321]; People v. Hinton, supra, 37 Cal.4th at p. 913; People v. Kennedy (2005) 36 Cal.4th 595, 641 [31 Cal.Rptr.3d 160, 115 P.3d 472].)
The trial court need not instruct, and the death penalty statute is not unconstitutional for failing to require, that a jury may impose the death sentence only if it is persuaded beyond a reasonable doubt that the aggravat *136 ing factors outweigh the mitigating factors and that death is the appropriate penalty. (People v. Box (2000) 23 Cal.4th 1153, 1216-1217 [99 Cal.Rptr.2d 69, 5 P.3d 130].) A capital jury need not apply any particular burden of proof in determining penalty (People v. Kipp (1998) 18 Cal.4th 349, 381 [75 Cal.Rptr.2d 716, 956 P.2d 1169]), nor must it reach unanimity on which aggravating factors apply (People v. Smith (2005) 35 Cal.4th 334, 374 [25 Cal.Rptr.3d 554, 107 P.3d 229]), in determining that death is the appropriate punishment.[6]
California’s death penalty law is not unconstitutional for not imposing, and a trial court does not err by not instructing on, a burden of proof that death is appropriate, either beyond a reasonable doubt or by a preponderance of the evidence. (People v. Perry, supra, 38 Cal.4th at p. 321; People v. Box, supra, 23 Cal.4th at p. 1216.) Neither is this state’s death penalty law invalid for not requiring a jury instruction on the burden of proof. (People v. Box, supra, at p. 1216; see also People v. Morrison (2004) 34 Cal.4th 698, 731 [21 Cal.Rptr.3d 682, 101 P.3d 568] [neither Apprendi v. New Jersey, supra, 530 U.S. 466, nor Ring v. Arizona, supra, 536 U.S. 584, warrants reconsideration of our conclusion that California’s death penalty statute is not unconstitutional because it does not provide the jury with instructions on the burden of proof].)
A jury in a capital case need not make written findings or achieve unanimity as to aggravating circumstances. (People v. Kennedy, supra, 36 Cal.4th at p. 641; People v. Morrison, supra, 34 Cal.4th at p. 730.)
California’s capital sentencing scheme does not run afoul of equal protection because our determinate sentencing law takes a different statutory approach to sentencing in noncapital cases. (People v. Smith, supra, 35 Cal.4th at pp. 374-375.) “[P]ersons convicted under the death penalty law are manifestly not similarly situated to persons convicted under the Determinate Sentencing Act and accordingly cannot assert a meritorious claim to the ‘benefits’ of the act under the equal protection clause.” (People v. Williams (1988) 45 Cal.3d 1268, 1330 [248 Cal.Rptr. 834, 756 P.2d 221].) Accordingly, our death penalty statute does deny equal protection to capital defendants by not requiring either jury unanimity on aggravating circumstances or written factual findings supporting the jury’s penalty determination. (People v. Smith *137 (2007) 40 Cal.4th 483, 527 [54 Cal.Rptr.3d 245, 150 P.3d 1224]; People v. Blair, supra, 36 Cal.4th at p. 754.)
The jury at the penalty phase properly may consider a defendant’s unadjudicated criminal activity and need not agree unanimously that the defendant committed those acts. (People v. Smith (2003) 30 Cal.4th 581, 642 [134 Cal.Rptr.2d 1, 68 P.3d 302]; People v. Michaels (2002) 28 Cal.4th 486, 541-542 [122 Cal.Rptr.2d 285, 49 P.3d 1032].)
The trial court need not label each sentencing factor as either aggravating or mitigating. (People v. Maury, supra, 30 Cal.4th at pp. 443-444.) In addition, the trial court is not required to delete inapplicable factors from the list of sentencing factors presented to the jury. (People v. Kennedy, supra, 36 Cal.4th at p. 641.)
The use of restrictive adjectives, such as “extreme” and “substantial,” in the sentencing statute and instructions do not render either unconstitutional. (People v. Kennedy, supra, 36 Cal.4th at p. 641.)
The language in CALJIC No. 8.88 directing the jury to determine whether the aggravating circumstances are “so substantial” in comparison to the mitigating circumstances is not unconstitutionally vague. (People v. Chatman (2006) 38 Cal.4th 344, 409 [42 Cal.Rptr.3d 621, 133 P.3d 534].) Moreover, CALJIC No. 8.88 is not defective in requiring the jury to determine whether the death penalty is “warranted” rather than “appropriate.” (People v. Perry, supra, 38 Cal.4th at p. 320.)
The trial court need not instruct the jury that a life sentence is mandatory if circumstances in aggravation do not outweigh those in mitigation. (People v. Perry, supra, 38 Cal.4th at p. 320.)
Finally, the federal Constitution does not require intercase proportionality review. (People v. Kennedy, supra, 36 Cal.4th at p. 641.)
V. Cumulative Error
Defendant argues that the cumulative effect of the alleged errors in both phases of his trial undermined the fundamental fairness of his trial and the reliability of his sentence. We have found no errors, and thus find no cumulative prejudice.
*138 VI. Disposition
The judgment is affirmed.
George, C. J., Baxter, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.
Appellant’s petition for a rehearing was denied July 25, 2007. Werdegar, J., did not participate therein.

 All statutory references are to the Penal Code unless otherwise noted.

 At defendant’s trial, Detective Wisberger testified that when he interviewed Snidow on March 14, 1996, Snidow confirmed that in September 1989 he had been stabbed by “several black males” at Folsom State Prison. Snidow then asked Wisberger, “What’s in this for me?” When Wisberger replied he had nothing to offer, Snidow refused to talk further.
Snidow testified at defendant’s capital trial that he did not remember whether he was incarcerated on September 15, 1989, or whether he had been stabbed at Folsom. Snidow further testified that he did not recognize pictures depicting his injuries and did not remember talking to Detective Wisberger about the stabbing.

 Defendant did not object at trial to the excusal of Prospective Juror S.M. This court has held that by failing to object a defendant does not forfeit a claim of error under Wainwright v. Witt (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844] and Witherspoon v. Illinois (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770] (People v. Schmeck (2005) 37 Cal.4th 240, 262 [33 Cal.Rptr.3d 397, 118 P.3d 451]; People v. Cleveland (2004) 32 Cal.4th 704, 734 [11 Cal.Rptr.3d 236, 86 P.3d 302]; People v. Memro (1995) 11 Cal.4th 786, 818 [47 Cal.Rptr.2d 219, 905 P.2d 1305]), and we have noted that the United States Supreme Court has considered such claims despite a defendant’s failure to object at trial. (People v. Holt (1997) 15 Cal.4th 619, 652, fn. 4 [63 Cal.Rptr.2d 782, 937 P.2d 213]; People v. Cain (1995) 10 Cal.4th 1, 61, fn. 22 [40 Cal.Rptr.2d 481, 892 P.2d 1224].) Finding no error on the merits, we need not address whether defendant here forfeited his claim of error.

 Defendant here and in a number of other claims urges that the error or misconduct he is asserting infringed various of his constitutional rights to due process and a fair trial. What we stated in People v. Boyer (2006) 38 Cal.4th 412, 441, footnote 17 [42 Cal.Rptr.3d 677, 133 P.3d 581], applies here. “In most instances, insofar as defendant raised the issue at all in the trial court, he failed explicitly to make some or all of the constitutional arguments he now advances. In each instance, unless otherwise indicated, it appears that either (1) the appellate claim is of a kind . . . that required no trial court action by the defendant to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court’s act or omission, insofar as wrong for the reasons actually presented to that court, had the additional legal consequence of violating the Constitution. To that extent, defendant’s new constitutional arguments are not forfeited on appeal. [Citations.] [f] In the latter instance, of course, rejection, on the merits, of a claim that the trial court erred on the issue actually before that court necessarily leads to rejection of the newly applied constitutional ‘gloss’ as well. No separate constitutional discussion is required in such cases, and we therefore provide none.”

 The Attorney General argues that defendant has preserved his claim of error to exhibit 15 only to the extent that more than one picture of each wound was admitted. He reasons: “This is because [defendant] effectively acquiesced to half of the photographs by stating that only one photograph for each wound was warranted.” Although defense counsel might have been more specific, it is apparent from the exchange between defense counsel and the trial court that the defense objected to the inflammatory nature of exhibit 15 as a whole, and to photograph “15-G” in particular. First, defense counsel informed the trial court that he wanted to “discuss” the autopsy photographs included in exhibit 15. During this discussion, defense counsel argued that photograph 15-G was “particularly inflammatory.” After discussing whether the photographs in exhibit 15 were cumulative of other photographs introduced at trial, defense counsel stated: “I’m particularly concerned about the inflammatory nature of People’s ‘G.’ Our objection would be most strenuous to that.”

 Former rule 420(b), of the California Rules of Court, renumbered rule 4.420 as of January 1, 2001, states that when a trial court under the Determinate Sentencing Act determines the base term of imprisonment, “[circumstances in aggravation and mitigation shall be established by a preponderance of the evidence.” Cunningham v. California (2007) 549 U.S. 270 [166 L.Ed.2d 856, 127 S.Ct. 856] as it applies to our Determinate Sentencing Act is not implicated by the penalty determination made in this capital case. (See People v. Prince (2007) 40 Cal.4th 1179, 1297-1298 [57 Cal.Rptr.3d 543].)