Filed 3/9/22 (unmodified opn. attached)

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,

Plaintiff and Respondent,

v.

WILLIAM LEE WRIGHT, JR.,

Defendant and Appellant.

S107900

Los Angeles County Superior Court

KA048285-01

---

## ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING

THE COURT:

The majority opinion in this case, filed on December 16, 2021, and appearing at 12 Cal.5th 419, is modified as follows:

1.   On page 436, in the first sentence of the first full paragraph, the phrase "abused its discretion" is replaced with "erred," so that the sentence begins:

> We first analyze whether the trial court erred . . . .

2.   On page 439, in the first sentence of the first full paragraph, the phrase "abuse its discretion" is replaced with "err," so that the sentence begins:

1

Under the totality of circumstances described in *Lynch*, the trial court did not err . . . .

This modification does not affect the judgment.

The petition for rehearing is denied.

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

WILLIAM LEE WRIGHT, JR.,
Defendant and Appellant.

S107900

Los Angeles County Superior Court
KA048285-01

December 16, 2021 (unmodified opinion)

Chief Justice Cantil-Sakauye authored the opinion of the Court, in which Justices Corrigan, Liu, Kruger, Groban, Jenkins, and Lui[*] concurred.

---

[*]     Administrative Presiding Justice of the Court of Appeal, Second Appellate District, Division Two, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

PEOPLE v. WRIGHT

S107900


Opinion of the Court by Cantil-Sakauye, C. J.


A jury convicted defendant, William Lee Wright, Jr., of the first degree murder of Philip Curtis, and found true the special circumstance allegations that he committed the murder during the commission of a robbery and a burglary. (Pen. Code, §§ 187, subd. (a) [murder], 190.2, subd. (a)(17)(i) [robbery murder], 190.2, subd. (a)(17) [burglary murder].)[1] The jury also convicted defendant of the attempted murders of Julius Martin, Douglas Priest, Mario Ralph, and Willie Alexander (§ 664; § 187, subd. (a)) and of robbery against Martin (§ 211). The jury found true several sentence enhancements connected to the additional charges. The jury returned a death verdict, and the trial court sentenced defendant to death in 2002. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment in its entirety.

## I. FACTUAL BACKGROUND

### A. Guilt Phase

#### 1. Prosecution Case

##### a. Long Beach Incident

On February 17, 2000, at approximately 2:00 a.m., defendant visited the Long Beach apartment of Douglas Priest

---

[1]    All further undesignated statutory references are to the Penal Code.

1

and Julius Martin, and he knocked on the door.[2] Priest had fallen asleep facedown on the living room floor after consuming approximately six beers and one or two shots of tequila. He awoke from the knock but did not move. Martin answered the door and let defendant inside. Defendant indicated he was there to buy marijuana, which Priest and Martin sold from the apartment along with cocaine. Martin told defendant that they had none. Defendant asked when they would have drugs available, to which Martin replied, "Probably tomorrow."

Defendant stood up to leave and Martin followed him to the door. Defendant turned around, pulled a knife from his right side and a gun from his left side and said, "This is a jack move." Meanwhile, Priest could hear Martin and defendant talking but he did not move. Although he could not identify all of what was said, the conversation made him uncomfortable. Defendant said to Martin, "You think I'm bullshitting?" Defendant then stabbed Priest in the back. Defendant said to Martin, "Give it up," and Martin produced $70 in cash from his pocket. Defendant asked, "Is that it?" Martin replied, "Yeah." Defendant ordered Martin to lie facedown on the ground and not look up. Martin complied. Defendant shot Martin twice in the back of the head. Martin lost consciousness.

After Priest heard the gunshots, he heard defendant open the door to leave and looked over his shoulder to see who had been in the apartment. He the saw the man's profile and recognized defendant based on his profile as well as his voice.

---

[2] Julius Martin was unavailable to testify at trial. The prosecution read into the record his preliminary hearing testimony.

He knew defendant as "Mad," a person who lived in a nearby building and frequently came to the apartment. Priest testified that he had no doubt that defendant was the man who stabbed him, noting that defendant had a distinctive voice and he had known defendant for a few months prior to the incident.

Once defendant left the apartment, Priest stood up, locked the door, and called 911. He checked on Martin, who was bleeding profusely out of the top of his head. Martin regained consciousness and responded to Priest calling his name. The police and paramedics arrived, and both men were taken to the hospital.

After he was admitted to the hospital, a detective attempted to ask Priest questions. Priest did not cooperate. He explained he was in pain at the time and on medication. He also believed the police were treating him like a suspect, rather than a victim. After they checked his hands for gunpowder residue he declined to speak with them further.

Four or five days later, Long Beach Police Detective Philip Cloughesy interviewed Martin in the hospital. Martin related that an individual he knew as "Mad" shot him, and that he knew "Mad" to be a member of the Crips street gang. He told Cloughesy that "Mad" lived around the corner from him, and he had known "Mad" for about one year. Martin said that Priest awoke after the individual had already left the apartment.

About one month after the incident, Priest saw a picture of defendant on the television news. He called Martin and said he saw "Mad" on the news being arrested by Ontario Police, put into a police car, and taken to jail in connection with a separate incident. Martin turned on his television news and also recognized defendant. He called the detective investigating his

shooting and explained that he saw the man who shot him on the news.

Priest subsequently identified defendant at a live lineup, at the preliminary hearing, and at trial. Martin identified defendant at a live lineup and at the preliminary hearing.

At the preliminary hearing, Martin acknowledged that on the night of the incident he did not tell officers that the man who shot him lived around the corner. He further acknowledged not telling the officers that he gave defendant $70, nor that he sold marijuana out of his apartment. At trial, Priest also acknowledged not telling officers that the man who stabbed him lived nearby, explaining that he had never been to defendant's residence.

### b. *Pomona Incident*

Mario Ralph, Phillip Curtis, and Willie Alexander sold rock cocaine from a house in Pomona. On March 21, 2000, between 6:00 p.m. and 7:00 p.m., defendant went to the house and bought $50 of rock cocaine. Curtis handled the transaction while Ralph was "on point" — meaning, Ralph would pat those who entered the house and then watch the person to make sure "things were straight." Ralph did not pat down defendant because he knew him; he had seen defendant approximately three times that week. He knew defendant to be a member of the Duroc gang.

After purchasing the $50 of rock cocaine, defendant sought to buy a larger quantity of drugs, but the men did not have more; Curtis asked defendant to come back at a later time. Defendant returned about one hour later. When defendant knocked on the door, Ralph was resting in one of the bedrooms. Ralph heard a lot of cussing and then heard defendant say, "Mother fuckers.

Duroc. Where is the dope at?" Ralph then heard three gunshots. He ran into the front room to see Curtis and Alexander had each been shot. Curtis was leaning over a table gasping for air and trying to pull a gun out of his pants pocket. Alexander was sitting on the couch with his cell phone in his hand.

Ralph saw defendant standing in the room. He reached for the gun that Curtis had put on the table. When Ralph's back was turned to defendant, as his hand grabbed the gun, defendant shot Ralph twice in the back. Ralph turned and tried to shoot defendant. He fired two shots before running out of bullets. Ralph briefly collapsed but managed to stand back up. He saw defendant run around the house and pick up the couch, asking, "Where's the motherfucking dope?"

Scared, Ralph ran toward the door to leave the house. Defendant ran toward the door at the same time. Ralph made it through the front door first, but defendant ran past him and entered a waiting car. Ralph briefly tried to run after the car.

Ralph returned to the house. He threw Curtis's gun on to the roof and then, once inside the house, flushed the remaining rock cocaine down the toilet. Ralph checked on Curtis, who said "What should I do? He shot me in the heart." Ralph ran outside again and asked a neighbor to call 911. At that point Ralph was having difficulty breathing and "everything was moving slow[ly]." Alexander walked outside and sat with Ralph on the porch to wait for the police and paramedics to arrive. Ralph thought he was going to die, so he sat there "trying to let it happen."

Sergeant Mark Warm was the first officer to arrive. Ralph approached him screaming that he had been shot, and Warm called an ambulance. Ralph gave Warm a description of the

shooter. At that time, Alexander walked toward Warm and Ralph. Alexander appeared to be in shock and was unable to answer any questions. Curtis was later found in the house and subsequently pronounced dead.

When Ralph was in the hospital, his cousin brought him a local newspaper in which Ralph saw a photograph of defendant. Ralph called the detectives and explained that he saw a newspaper picture of the man who shot him. Ralph subsequently identified defendant in a photographic lineup. Ralph also identified defendant at a live lineup, at the preliminary hearing, and at trial.

As a result of being shot, Ralph had been hospitalized several times, lost a kidney and 100 feet of intestines, and used a colostomy bag. Occasionally he had difficulty eating and drinking.

### c. The Investigation

In Long Beach, officers recovered a small amount of marijuana and a .357 caliber revolver from the apartment. They also recovered a bullet fragment laying on Martin's shirt, which had been left on the floor after paramedics treated him at the scene.

Following the Pomona incident, a crime scene investigator recovered Curtis's handgun, a .380 caliber semiautomatic, in a walkway area between the Pomona house and a neighboring house. He also recovered two spent shell casings inside the house. The investigator located, inside a bedroom closet, a bullet that he testified had been fired from the front of the house and gone through several walls before landing in the closet.

The doctor who performed the autopsy on Curtis testified that he died from a single gunshot wound to the chest. He

recovered a .32 caliber bullet from Curtis's vertebra. The bullet entered the left side of the chest, went through the heart, and into the upper abdomen, where it lodged in a vertebra.

On March 24, 2000, Ontario Police Officer Joseph Giallo arrested defendant in an Ontario apartment for an unrelated incident. Defendant and his future wife, Janice Marrow-Wright, were the only people present in the apartment. When Giallo searched the apartment in conjunction with the arrest, he located a dark-colored .32 caliber revolver under couch cushions. Defendant's ex-wife, Toni Wright, testified that on March 22, 2000, she had seen defendant in possession of a small dark-colored handgun.

Dale Higashi, a senior criminalist with the Los Angeles County Sheriff's Department, studied the ballistics evidence. He examined Curtis's .380 caliber semiautomatic handgun, which was found at the Pomona house, and the .32 caliber revolver found at the Ontario apartment where defendant was arrested. Higashi also scrutinized the .32 caliber bullet recovered from Curtis's body and the .32 caliber bullet recovered from the Pomona house closet, and he concluded they had both been fired from the dark-colored revolver found when defendant was arrested. After examination, Higashi also concluded the bullet fragment recovered from the Long Beach apartment was fired by defendant's revolver.

Higashi additionally inspected the two shell casings found in the Pomona house and concluded they had been fired from Curtis's .380 semiautomatic handgun.

### 2. Defense Case

Long Beach Police Officer Joseph Seminara responded to the Long Beach apartment on February 17, 2000. Seminara

briefly questioned Priest and Martin at the apartment. Priest told him that he was asleep on the floor and woke up to the sound of gunshots. Priest said he had no idea how he had been stabbed and that the assailant had already fled the scene when he awoke. Seminara testified that Priest was being treated by paramedics at the time he was being questioned and appeared to be in pain. Martin told Seminara that he did not know how Priest had been stabbed. It was clear to Seminara that Martin had been shot "several times" in the head and appeared to be in pain as paramedics were treating him. Seminara and Martin spoke for less than 30 seconds.

Alexander testified at trial for the defense. He acknowledged being at the Pomona house on March 21, 2000, but claimed he did not remember who else was there with him. He denied knowing that narcotics were sold from the house. When defense counsel asked if defendant was the man who shot them, Alexander said, "I'm sorry, that's not the person. I ain't never seen him before." He also denied at the preliminary hearing that defendant was the shooter.

On cross-examination, Alexander admitted being arrested for selling rock cocaine in another drug house a few months after the Pomona shooting. He was serving a six-year prison sentence on that charge and did not receive any benefit in that case for testifying in defendant's trial. Alexander agreed with the prosecutor's statement that an inmate in prison "might have to pay a price" for cooperating with law enforcement and testifying in court. Alexander acknowledged previously identifying defendant as the shooter in a live lineup but claimed he did not actually know who shot him and he "just chose anybody."

Detective Gregg Guenther spoke with Ralph multiple times after the Pomona incident. Ralph told Guenther that the shooter had used a small black semiautomatic pistol. He also told the detective that he had seen the shooter approximately 10 times before the incident. He did not initially tell Guenther that he had fired shots with Curtis's gun. Guenther could not recall whether gunshot residue tests were performed on the hands of Alexander or Curtis and did not believe a residue test had been performed on Ralph.

### 3. *Prosecution Rebuttal*

Detective Guenther testified that he interviewed Alexander in the hospital. Alexander told him that he saw the man who had shot him, Curtis, and Ralph in a local newspaper and on television. Guenther showed Alexander a photo lineup at the hospital, during which Alexander identified defendant as the person who shot the three men. At a subsequent live lineup, Alexander again identified defendant as the assailant. Shortly after Alexander was sent to prison on the cocaine charges, Guenther spoke with him to determine whether Alexander would still testify in defendant's case. He told the detective that now that he was in prison, he could not testify without facing retaliation.

Prior to the preliminary hearing, Detective Guenther and his partner drove Alexander from prison to the city jail so that he could testify without having to ride on statewide transportation with other inmates. During the drive, Alexander told Guenther that he could not testify against defendant out of concern for his own safety. The night before the hearing, at the city jail, Alexander again expressed concern about his own safety if he were to testify.

### B. Penalty Phase

#### 1. *Prosecution Case*

The prosecution introduced evidence of two prior felony convictions:  second degree robbery at a restaurant in 1989 and evading a police officer in 1999.

The prosecution also introduced several acts or threats of violence:  (1) on June 23, 1992, defendant fired shots at a rival gang member's residence; (2) on September 6, 1994, defendant attacked a fellow inmate in prison and refused to comply with officer commands; (3) on March 22, 2000, defendant shot his ex-wife in her face; (4) on March 23–24, 2000, when officers tried to take him into custody, defendant barricaded himself and five hostages in the apartment, fired approximately 14 shots at police officers, and was eventually taken into custody after tear gas was deployed; (5) on June 28, 2001, a corrections officer found an inmate-manufactured spear in defendant's jail cell; (6) on July 10, 2001, defendant threw bleach at a corrections officer's face and was found in possession of razor blades, fishing line, and extra linens in his jail cell; and (7) on October 28, 2001, defendant threatened a corrections officer and then physically attacked him.

#### 2. *Defense Case*

Janice Marrow-Wright, defendant's wife, testified regarding the hostage incident on March 23, 2000.  She stated that she, her mother, her three nephews, and defendant were present at her mother's apartment that day.  She denied that defendant ever prevented her, her mother, or the children from leaving the house.  She said she did not release the children once hostage negotiations began because she did not trust the police.  She asserted that defendant had never been disrespectful to

anyone in her presence. During cross-examination, Marrow-Wright denied telling the police that she and her mother had been through a "traumatic experience" when speaking about the hostage situation and denied saying that defendant had previously abused her. She also denied telling the police that defendant was a "gangster," that she regretted meeting him, and that he had dangerous friends. On cross-examination, Marrow-Wright testified that she married defendant in August 2000, after he was already incarcerated. She explained that there was no marriage certificate because it "was done as an agreement" as a "common law" marriage.

Juanita Anderson testified that she was a friend of defendant's family and had known him for 30 years. She related that defendant was always respectful and kind to her and would call her weekly to check in on her.

Donell Walls testified that he had known defendant from the time they met in elementary school. Defendant was a generous person, a friend to him, and treated his family well. During cross-examination, he acknowledged that defendant may have had "psychological problems" when they were in high school and recalled that defendant had difficulty understanding some things while playing football.

Melinda Mix testified that she had been friends with defendant for 15 years. She knew him to be a good person and had never seen him be disrespectful to anyone. During cross-examination, she explained that they had dated, and she still considered herself to be his girlfriend. She knew he was in a relationship with Marrow-Wright but was unaware that they had married.

David Jimenez, a psychologist, evaluated defendant through three face-to-face interviews, communication with defendant's parents, a review of relevant police reports, and a study of two prior psychological evaluations. During their first interview, defendant complained of difficulty sleeping and the effects of the antipsychotic medication he was taking. During their second interview, defendant was not compliant and refused to answer Dr. Jimenez's questions. During their third interview, Dr. Jimenez attempted to administer two psychological tests but did not believe defendant gave "his best efforts" and did not include the results from the tests in his report. He attempted to see defendant for a fourth visit, but defendant declined to meet with him.

Defendant told Dr. Jimenez that he joined the Duroc gang at the age of nine and that one of his "homeboys" died in his arms when he was 15 years old. Defendant said that he had attempted suicide when he was 12 or 13 years old, but his parents told Dr. Jimenez that they "could not recall anything of that nature." Defendant also reported that he had used PCP on more than 100 occasions, liked rock cocaine and marijuana, and consumed alcohol daily.

Dr. Jimenez testified that on at least two occasions, defendant attempted to fake a mental disorder or illness. Because defendant did not fully comply with the evaluations, partly because he was feigning mental illness, Dr. Jimenez could not rule out a mental disorder.

## II. Discussion

### A. Counsel's Representation

Defendant contends the trial court committed reversible error when it denied his request for self-representation under

*Faretta v. California* (1975) 422 U.S. 806 (*Faretta*), made two days prior to the scheduled trial date. He further contends the trial court abused its discretion when it denied his motion to substitute counsel under *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

### 1. Factual Background

The parties first appeared before the assigned trial court in September 2001 and set a trial date of March 12, 2002. At the next hearing on December 17, 2001, the parties confirmed they would be ready to proceed on March 12 and had no pending motions. On March 4, 2002, defense counsel moved to continue the trial date. He explained that he was still receiving discovery and had neither identified nor interviewed all potential witnesses. At a hearing on March 12, counsel proposed to set March 26 for motions and April 29 for trial. The prosecution and trial court agreed.

On Monday, April 29, 2002, the parties met for a trial readiness conference. The court set Wednesday, May 1, 2002, as the first day of trial and then asked the parties if there was anything to discuss. Defense counsel stated that the previous Wednesday, defendant indicated that he was considering moving to represent himself. When defense counsel followed up with defendant that morning, he confirmed it was his desire to proceed in propria persona. The trial court asked defendant why he wanted to represent himself. Defendant replied, "I have a right under *Faretta*, don't I?" The court said yes, but that the question was why he wanted to so proceed. Defendant replied, "Conflict between me and my attorney." The court cleared the courtroom to conduct a *Marsden* hearing.

The court asked defendant what conflict he had with counsel. Defendant said, "I have a witness that has got some information, a witness to help me in my case. And my attorney [is] refusing to call her back, or to call her to get this information. Plus, I don't see where — where the defense is being put up on my behalf." Defense counsel explained that the witness defendant referred to was his girlfriend. Counsel said he had spoken to defendant's girlfriend "numerous times" throughout the case, but "it got to a position where I felt that she was what I refer to as an intermeddler in the case. And I have indicated to Mr. Wright that . . . I am not discussing anything with her anymore." Counsel continued, "He did indicate that she had some information. She said that all along. Nothing helpful has come forward. I had my investigator contact her. She made some calls over to my investigator's office and never gave us any information. And as I refer to it, she is an officious intermeddler as far as I am concerned. And I indicated to her if she [has] any information, she can give it to my investigator. And that hasn't happened, and I don't have any faith that she has any information in regards to that."

The court asked defendant what information his girlfriend had. He replied, "The addresses of the peoples that was — that supposed to had did one of these crimes, [*sic*] supposed to be a witness to come forth and bring up their names. I don't have them." The court asked why she had not given that information to defense counsel. Defendant said, "She have called numerous times to the investigator and [defense counsel]. Nobody has returned her calls." The court offered to have defendant's girlfriend come into court and give the information to defense counsel that way. Defense counsel responded, "She could have

14

given it to [defendant], your honor, and he could have given it the investigator. That hasn't happened either."

The court noted that defendant had a second concern and asked for him to elaborate. Defendant said, "There is no defense being put up on my behalf." Defense counsel explained that he had discussed defense strategy with defendant numerous times and outlined that the defense would be "basically through cross-examination of the witnesses. And I pointed out to him what I thought would be helpful to us in the testimony and various witnesses, particularly Willie Alexander at the preliminary hearing testified on our behalf. And that's where I stand in regards to that." The court asked defendant if he had anything more to add; he declined. The court brought the prosecutor back into the courtroom and resumed proceedings in open court.

The trial court found there was insufficient conflict to warrant changing defense counsel and denied the *Marsden* motion. The court continued, "The issue about representing yourself, you can always represent yourself. I am required, as you know, to let you do that as long as you understand what you are getting yourself into. And it is your belief that you can do a better job than your attorney on this?" Defendant responded, "Yes." The court reminded defendant that trial was starting two days later, regardless of whether defendant proceeded by himself. "We have set the date. We have 200 jurors coming in. We have cleared this court's calendar. The witnesses have been subpoenaed for that particular date. . . . We have set it on Wednesday so we can have the jurors actually present and give them the questionnaires that will be necessary in this case. There is no good cause to put the matter over. If you wish to represent yourself, certainly at any stage you can do that. And but [*sic*] you should understand you won't even be in the pro.

per. [housing] module by the time we start trial. That won't happen until the weekend. You do understand all of this?" Defendant confirmed that he did.

The court asked defendant if he understood that he would be treated as an attorney, would not receive any assistance from the court, and would be required "to do it all just like the prosecutor is on his own to do it all." Defendant replied, "Yes. I just need time to prepare for my case." The court told defendant he did not have more time because trial was set for Wednesday. Defendant said he would not be ready by then, to which the court replied that if defendant was not prepared in two days, he could not represent himself. Defendant stated that he had the right to represent himself. The court explained, "You have the right to go to trial, and you also have the right to represent yourself. And they are in conflict right now. I am not putting the case over. Why didn't you bring this up before?" Defendant said, "Just really transpired when I talked to my lawyer to cross-examine one of the deputies. I feel he wasn't aggressive enough, and this is a death penalty case." The court asked defendant if he believed he could do a better job than counsel. Defendant said yes, but he needed time to prepare his case. The court asked defendant if he had represented himself before. Defendant said, "No, I haven't. But I been in the courts long enough to know how to represent myself."

The judge reiterated that defendant could represent himself, but the trial date would not be continued. Defendant again said that he could not be ready within two days. The court asked defendant if he had previously discussed self-representation with defense counsel. Defendant said he first brought it up the previous Wednesday. The court reminded defendant that the case had been ongoing for more than one

year. Defendant replied, "You put me in a position I am going to represent myself, but I am not going to be ready on Wednesday." The court said, "That is up to you. The first thing I am going to do is allow you to fill in the pro. per. advisement form. And I want you to think about this a little while because obviously you didn't know I was going to say no [continuance]. But now you know I am going to say no as far as a continuance is concerned. We are going to trial Wednesday. You can either do it by yourself, which I am telling you is a terrible mistake. I am not going to equivocate with you. Or you can go to trial with [defense counsel]." Defendant again said he would not be ready to go by Wednesday. The trial court said, "But that is not the issue. Those are your two choices. Either going to trial by yourself Wednesday, or [defense counsel] represents you. I want you to think about it while you fill in that piece of paper."

The court took a break and reconvened fifteen minutes later to review defendant's self-representation advisement form. When the court asked defendant if he had any questions about anything on the form, defendant replied, "No." The court noted that defendant had not filled in the portion indicating what crimes he would be charged with, and asked defendant what crimes he was charged with. Defendant replied, "Murder and 4 counts of attempted murder and a robbery." The court then asked defendant, "And what kind of continuance are you asking for?" Defendant said, "Some time to prepare for my case." The court asked again how much time he needed. Defendant said, "I don't know. A month, two."

The trial court noted that defense counsel had represented defendant at the preliminary hearing, at which time defendant had a chance to evaluate counsel's ability to cross-examine witnesses. The court asked defendant why he did not raise the

issue at that time. Defendant said he did not notice an issue until recently. Defendant continued, "If the court [is] going to deny me time to prepare for my case, I will proceed with [counsel]."

The court denied defendant's *Faretta* motion as untimely. In the course of noting the areas on the form that defendant failed to initial, the court further stated that it did not believe defendant thoroughly understood what he was trying to do. The court opined that defense counsel "is doing a very good job for you. He has filed and argued numerous motions on your behalf. He has been able to keep out some of the penalty phase evidence that the People, after being forced to review by [defense counsel], have decided not to bring forward. The court denied the People's request for one piece of penalty phase evidence. So he is doing a good job. His job is also to evaluate the evidence before putting it on. And I think, again, he is doing a fine job. He has experience in this area. He knows what he is doing. The court is going to deny the request for pro. per. status based on the fact that it is untimely. And the defendant would clearly need time to prepare."

Voir dire commenced on Wednesday, May 1, 2002, as planned.

### 2. *Motion for Self-Representation*

The United States Supreme Court has made clear that a criminal defendant has a federal constitutional right to represent himself if he voluntarily and intelligently so chooses. (*Faretta*, *supra*, 422 U.S. at pp. 835–836.) A trial court must grant a defendant's request for self-representation if the request is made within a reasonable time prior to the commencement of trial, is unequivocal, and is made voluntarily, knowingly, and

intelligently. (*People v. Lynch* (2010) 50 Cal.4th 693, 721 (*Lynch*).) If a self-representation motion is untimely, it is "within the sound discretion of the trial court to determine whether such a defendant may dismiss counsel and proceed *pro se*." (*People v. Windham* (1977) 19 Cal.3d 121, 124 (*Windham*).)

We first analyze whether the trial court abused its discretion in finding the motion untimely under *Lynch*. "We have long held that a *Faretta* motion is timely if it is made 'within a reasonable time prior to the commencement of trial.' " (*People v. Johnson* (2019) 8 Cal.5th 475, 499 (*Johnson*).) "[T]he 'reasonable time' requirement 'must not be used as a means of limiting a defendant's *constitutional* right of self-representation,' but rather to prevent the defendant from 'misus[ing] the *Faretta* mandate as a means to unjustifiably delay a scheduled trial or to obstruct the orderly administration of justice.' " (*Ibid.*)

We have routinely declined to identify a specific period in time at which a self-representation motion is untimely. "[W]e have held on numerous occasions that *Faretta* motions made on the eve of trial are untimely." (*Lynch*, *supra*, 50 Cal.4th at p. 722.) In *People v. Frierson* (1991) 53 Cal.3d 730, 742, we held that a motion for self-representation made two days before the set trial date was made on "the eve of trial" and thus untimely. In *People v. Clark* (1992) 3 Cal.4th 41, 99, we found a *Faretta* motion was untimely when it was made several days after the case had been continued day-to-day "in the expectation that the motions would be concluded and jury selection set to begin at any time." In *People v. Valdez* (2004) 32 Cal.4th 73, 102, we held the *Faretta* motion "made moments before jury selection was set to begin" was untimely.

We also have held that *Faretta* motions "made long before trial were timely." (*Lynch, supra,* 50 Cal.4th at p. 723; see *People v. Stanley* (2006) 39 Cal.4th 913, 932 [*Faretta* motion made nearly two years before trial was timely]; *People v. Dent* (2003) 30 Cal.4th 213, 221 [*Faretta* motion made four months before trial was timely].) "Nevertheless, our refusal to identify a single point in time at which a self-representation motion filed before trial is untimely indicates that outside these two extreme time periods, pertinent considerations may extend beyond a mere counting of the days between the motion and the scheduled trial date." (*Lynch, supra,* 50 Cal.4th at p. 723, fn. omitted.)

In *Lynch,* we concluded that "a trial court may consider the totality of circumstances in determining whether a defendant's pretrial motion for self-representation is timely." (*Lynch, supra,* 50 Cal.4th at p. 726.) We held that a trial court may properly consider "not only the time between the motion and the scheduled trial date, but also such factors as whether trial counsel is ready to proceed to trial, the number of witnesses and the reluctance or availability of crucial trial witnesses, the complexity of the case, any ongoing pretrial proceedings, and whether the defendant had earlier opportunities to assert his right of self-representation." (*Ibid.*)

We have declined to articulate what standard a reviewing court should apply in determining whether a request for self-representation is timely. (*Johnson, supra,* 8 Cal.5th at p. 501.) And yet defendant's claim here fails under both de novo review and a more deferential standard.

Defendant acknowledges that his request was made close in time to the scheduled trial start date. He asserts, however, that under the totality of circumstances his request was

nonetheless timely. We disagree. Defendant brought this motion two days before the scheduled trial date and conditioned his motion on the grant of a continuance, telling the court that if he did not have time to prepare, he would proceed with counsel. Further, he could not identify with any degree of precision how much time he thought he would need, opining perhaps a month or maybe two.

Defendant argues it is significant that at the time he made his motion, neither the prosecution nor defense counsel indicated readiness to proceed. However, on April 11, 2002, the parties had stated that there were no witness issues to report, discussed evidence to be presented during trial, and confirmed that previous issues with discovery had been resolved. On April 15, 2002, the parties discussed the juror questionnaires and whether defendant would be shackled. At the conclusion of the hearing, the parties confirmed there was nothing else to discuss before the trial readiness conference on April 29. On April 29, the trial court stated, "Today was really a clean-up day. Make sure we are ready to go, and that there are no problems." When the court asked if either party had anything to discuss, defense counsel explained, for the first time, that defendant wanted to represent himself. Although neither party explicitly stated readiness to proceed, neither party stated otherwise when asked if there were any problems, and the record strongly supports a conclusion that the parties were prepared to proceed at that time and the court understood that each party was so prepared. Finally, the fact that trial started two days after defendant's motion, as planned, further indicates that the parties were ready to proceed on time.

Defendant argues he could not have asserted his right to represent himself sooner because his concerns had not arisen

until right before he brought his motion, but the record does not support this. Defendant informed the trial court on April 29 that he had concerns about his lawyer cross-examining one of the deputies, and defendant now contends this was raised as soon as practicable after he had an opportunity to discuss this concern with counsel. The hearing at which the cross-examination occurred took place on April 11, 2002; defendant waited 18 days to assert his *Faretta* right. Counsel told the trial court during the *Marsden* hearing that he had explained the trial strategy to defendant numerous times prior, not simply at their meeting four days prior when defendant first told counsel he was interested in representing himself. When the court invited defendant to comment, he did not challenge counsel's statement. Defendant expressed additional concerns to the trial court regarding counsel's alleged refusal to contact his girlfriend for information. The record indicates that this was an ongoing issue between defendant and counsel and not something that arose just before defendant made his *Faretta* motion.

Moreover, the trial court expressed skepticism concerning whether defendant intended to seriously represent himself or whether he merely sought to delay trial. After defendant complained that counsel had not returned his girlfriend's calls, the trial court offered to have her come to court to address counsel. Defendant did not offer a response to the court's invitation. Later, the court asked defendant why he did not make his request sooner and stated that it would not continue the trial. Defendant interrupted the court and challenged it by stating that the court could "either just deny me and I put it up for appeal, or grant me my motion to — ." The court cut off defendant and said, "It seems to me you are setting up another issue for appeal that you are not really . . . taking to be serious."

In further support of his argument that his motion was timely under *Lynch*, defendant asserts the prosecution's case was straightforward, and there had been only minimal discovery. Yet he fails to persuasively articulate in what way this case, consisting of one murder and four attempted murders arising out of two separate incidents, was straightforward. Nor does he address how a sudden switch to self-representation could have occurred without unduly disrupting the ongoing process.

Defendant contends a continuance would not have impaired the prosecution's ability to produce its witnesses. A continuance, however, could have impaired the prosecution's ability to produce Julius Martin, one of its key witnesses. The prosecution had a right to present Martin's live testimony as the preferred form of evidence. (See *People v. Reed* (1996) 13 Cal.4th 217, 225 ["The fundamental purpose of the unavailability requirement is to ensure that prior testimony is substituted for live testimony, the generally preferred form of evidence, only when necessary"].) As defendant acknowledges, Martin was suffering ongoing health issues as a result of the shooting. Martin was ultimately ruled unavailable to testify as a witness; the prosecution introduced his preliminary hearing transcript into the record. Defendant argues that because Martin was able to testify live during the penalty phase, a continuance would have been favorable because Martin may have recovered enough to testify live during a later-held guilt phase trial as well. This circumstance was unknown at the time, however, and the prosecution could rightly have had concerns regarding how Martin's health would change if the trial was continued.

Under the totality of circumstances described in *Lynch*, the trial court did not abuse its discretion in finding defendant's *Faretta* motion to be untimely.

Defendant asserts that even if his request to represent himself was properly deemed untimely, the trial court nonetheless abused its discretion in denying the motion. We analyze whether the trial court abused its discretion in denying an untimely motion under *Windham, supra,* 19 Cal.3d 121, which states that once a trial court has ruled a *Faretta* motion untimely, it must exercise discretion in determining whether to grant or deny a defendant's request for self-representation. (*Id.* at p. 131.) In *Windham,* we explained that when a defendant requests to represent himself in the middle of trial, the court must inquire into the specific factors underlying the request. (*Id.* at p. 128.) Additionally, "other factors to be considered by the court in assessing such requests made after the commencement of trial are the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion." (*Ibid*.)

We discern no abuse in the court's decision to deny the motion. The court found defense counsel was acting competently on defendant's behalf, noting that he had filed and argued numerous motions and prevented the prosecution from introducing certain penalty phase evidence. Although defendant exhibited no prior proclivity to substitute counsel, the court further found defendant's reasons for his request to be inadequate, noting that defendant did not appear to fully understand what he was "getting [himself] into" by asking to

represent himself. Finally, the court found that granting defendant's motion would cause disruption and delay in trial proceedings due to the accompanying request to continue.

The Attorney General argues that defendant's motion was equivocal in any event. Because the trial court properly denied defendant's motion to represent himself, we need not determine whether his request was equivocal.

Finally, defendant challenges the constitutionality of the timeliness requirement. We have repeatedly held that a *Faretta* motion may be denied if not made within a reasonable time prior to the commencement of trial. (See *Johnson*, *supra*, 8 Cal.5th at p. 499 [a trial court has the discretion to deny an untimely motion for self-representation]; *Lynch, supra,* 50 Cal.4th at pp. 721–722 [" 'the right of self-representation is not absolute' " and may be denied if the motion is deemed untimely]; *People v. Hamilton* (1988) 45 Cal.3d 351, 369 [a *Faretta* motion must be timely "for purposes of invoking an absolute right of self-representation"]; *Windham, supra,* 19 Cal.3d at pp. 127–128 ["in order to invoke the constitutionally mandated unconditional right of self-representation a defendant in a criminal trial should make an unequivocal assertion of that right within a reasonable time prior to the commencement of trial"].) Contrary to defendant's argument, the timing of a *Faretta* motion is only one of several factors considered before a trial court can hold a motion untimely (*Lynch, supra,* 50 Cal.4th at p. 726), and we have never held that timeliness alone is a sufficient basis on which to deny a *Faretta* motion. Defendant does not present a persuasive reason to revisit precedent on this matter.

### 3. *Motion to Substitute Counsel*

Defendant contends the trial court abused its discretion when it denied his *Marsden* motion because the record showed counsel was constitutionally deficient.

" ' " ' " 'When a defendant seeks to discharge his appointed counsel and substitute another attorney, *and asserts inadequate representation*, the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of the attorney's inadequate performance.' " ' " ' " (*People v. Johnson* (2018) 6 Cal.5th 541, 572; *People v. Vines* (2011) 51 Cal.4th 830, 878.) We review a trial court's decision not to discharge appointed counsel under the deferential abuse-of-discretion standard. (*People v. Jones* (2003) 29 Cal.4th 1229, 1245.)

Defendant acknowledges that after he requested the trial court relieve counsel, the court properly permitted him to explain the basis for his motion. He asserts, however, that the court erred in failing to act on the information it received regarding counsel's alleged failure to follow up with defendant's girlfriend about alleged exculpatory information. Counsel confirmed that he had contacted defendant's girlfriend on several occasions but had not obtained information from her concerning a potential third-party culpability defense, nor was he investigating third-party culpability in defendant's case. Defendant asserts that this in itself established that counsel's performance was constitutionally inadequate, and hence the trial court abused its discretion in denying his motion. He further asserts the court did not conduct an adequate inquiry.

First, defendant fails to establish the trial court's inquiry was inadequate. As observed earlier, the court heard

defendant's complaint regarding his attorney's failure to obtain information from defendant's girlfriend and requested that counsel respond.  Defense counsel explained to the court that he had spoken to defendant's girlfriend several times, and she refused to provide any information to him.  He instructed her to contact his investigator if she had any information, which she did not do.  Defense counsel stated that, based on his interactions with defendant's girlfriend, he did not believe she had any helpful information for the defense team.  When defendant mentioned he was also concerned about an alleged lack of a defense case, the court again asked counsel to respond.  Counsel stated that he had gone over defense strategy with defendant "numerous times" and explained he would primarily focus on the cross-examination of witnesses.  The trial court provided defendant "full opportunity to air all of his complaints, and counsel to respond to them."  (*People v. Smith* (2003) 30 Cal.4th 581, 606; see *People v. Abilez* (2007) 41 Cal.4th 472, 488 [dismissing the defendant's complaint that the trial court's inquiry was insufficient when the court gave the defendant the chance to discuss his complaints and counsel the chance to respond].)  No more was necessary.

Second, the court did not abuse its discretion when it denied the *Marsden* motion.  Defendant's complaints regarding counsel's investigation and trial strategy were "tactical disagreements, which do not by themselves constitute an 'irreconcilable conflict.' " (*People v. Cole* (2004) 33 Cal.4th 1158, 1192.)  Defendant presented no evidence that counsel's performance was so deficient that constitutionally ineffective representation was likely to result.

## B. Asserted Prosecutorial Misconduct

Defendant contends the prosecutor presented inadmissible and highly prejudicial evidence that severely biased the jury against him and led to a conviction based not on the evidence but on his perceived character and history. He specifically challenges the introduction of two pieces of evidence: (1) that defendant's ex-wife, Toni Wright, observed defendant point a gun at someone; and (2) a statement from an expert witness that defendant had been in prison for a "long, long time" prior to the trial.

### 1. *Factual Background*

During the guilt phase, the prosecutor sought to introduce evidence that defendant shot his ex-wife, Toni Wright, in the head. He argued that the evidence was relevant because defendant shot her with a small, dark-colored revolver within a day or two of the Pomona incident. Experts linked bullets from the Long Beach and Pomona incidents to the revolver used to shoot Ms. Wright, and because defendant raised the issue of identity, the prosecutor argued that this incident was relevant to identity and intent with respect to the charged offenses. Defense counsel objected, arguing that there was no indication Ms. Wright could identify which gun was used against her. He continued, "And this is the District Attorney's effort to try to bootstrap some evidence that is tremendously prejudicial to my client and will have little or no probative value in regards to the charges that he is on trial for." The court ruled that Ms. Wright could testify that she knew defendant had a black handgun but could not testify about the shooting. The court found that "the prejudice far outweighs any probative value or any relevance. It is just — it is too much, quite frankly, for the amount of relevant

material in there.  But she can come in and say she saw him hold a black handgun."

When the prosecutor called Ms. Wright, he asked, "On March the 22nd of the year 2000, did you see William Wright with a small, dark-colored handgun?"  She replied, "Yes."  He continued, "Did you see him point that gun at somebody?"  She replied, "Yes."  After asking Ms. Wright to identify defendant in the courtroom, the prosecutor asked, "When you saw him point the handgun at somebody, was that in the city of Ontario?"  At that point defense counsel objected and moved for a mistrial.  He argued that the prosecutor's question was prejudicial to defendant and against what the parties had previously agreed upon.  The prosecutor argued that his question was not in conflict with the court's prior ruling.  He continued, "If it is, I didn't ask who he pointed it at."

The trial court agreed that the prosecutor's line of questioning had gone too far but found the error harmless.  The court noted that the prosecutor did not ask about how the gun was used, and the fact that it was pointed "just indicates to the jurors how she was able to see it."  The court denied the motion for a mistrial.  When questioning resumed, the prosecutor asked Ms. Wright, "When you observed Mr. Wright with the gun, that was not in any kind of drug house, was it?"  She replied, "No."  The prosecutor asked her no more questions.

The prosecutor also called David Bly, a Los Angeles County Sheriff's Department detective, to testify as an expert witness on gangs.  Bly explained his knowledge of the Duroc Crips gang and asserted, based on his review of records in which defendant admitted he was a member and based on defendant's tattoos, that defendant was a member of the gang.  During cross-

examination, Bly confirmed that he had neither interviewed defendant nor had any personal contact with him. Defense counsel asked Bly, "Now you indicated that you have met a number of Duroc gang members; is that correct?" After Bly answered affirmatively, counsel asked approximately how many. Bly replied, "Over a hundred, say a hundred to 200." On redirect examination, the prosecutor asked Bly, "Sir, if there is a particular member that is not in the community for a long, long time, you might not come in contact with him; is that correct?" After Bly confirmed that was correct, the prosecutor continued: "If he is living somewhere else or if he is incarcerated perhaps or something like that, you wouldn't know; is that correct?"

Defense counsel objected to this question, arguing that the prosecutor "is trying to give the insinuation that my client was in custody and I think that's improper to put that off to the jury." The prosecutor replied, "Judge, I never on direct asked this man if he had personal contact with [defendant]. Counsel on cross, for whatever reason, chose to ask that. Once he asked that, I simply have a right to inquire of Mr. Bly, if someone is not in the community, I didn't say simply in custody, I said if someone is not in the community, living someplace else or in custody, you wouldn't be coming in contact with him? That is clearly a permissible question based on what counsel asked. I never asked that witness anything on direct plus the witness testified at the prelim so counsel cannot say he was in any way surprised by what he might or might not say. And he cross-examined the witness at the prelim. So I think, under those circumstances, it's clearly, that limited question is clearly permissible." The trial court overruled the objection, finding the question was within the scope of cross-examination and permissible. The

court continued, "I don't think that counsel is honing in and I will not permit counsel to hone in on that issue. I think it was broad enough. And it was a reasonable question, given the cross-examination."

### 2. *Discussion*

Defendant argues the prosecutor committed prejudicial misconduct by failing to abide by the court's prohibition against soliciting evidence of defendant's use of the handgun. He also argues the prosecutor's questions to Bly constituted an improper attempt to "rehabilitate" a witness who had, in fact, not been challenged in that respect on cross-examination.

" 'The applicable federal and state standards regarding prosecutorial misconduct are well established. " 'A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " ' [Citation.]" (*People v. Hill* (1998) 17 Cal.4th 800, 819.)

As an initial matter, we note that defendant has forfeited his prosecutorial misconduct allegation as to the questioning of Ms. Wright. " 'To preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition; otherwise, the point is reviewable only if an admonition would not have cured the harm caused by the misconduct.' " (*People v. Silva* (2001) 25 Cal.4th 345, 373.) Defense counsel did not request a curative admonition after the

trial court agreed that the prosecutor's questioning had gone too far. Further, he cannot establish that an admonition would not have cured any alleged harm.

In any event, we need not decide whether the prosecutor committed misconduct because any possible error was harmless. Defendant contends Ms. Wright's testimony was prejudicial because it implied he was "the type of person who used guns against people," and thus made it more likely for the jurors to believe he was the one who committed the charged offenses. On this record, however, there were many facts that undermined the defense theory, regardless of the challenged line of questioning. The jury heard evidence that defendant shot Martin, Curtis, Ralph, and Alexander. The jury also heard testimony that the bullets recovered from Curtis's body, and from the Pomona and Long Beach crime scenes, were fired from the gun found in defendant's possession at the time of his arrest. Finally, we note that the prosecutor did not ask Ms. Wright how the gun was used. In light of the other substantial and properly adduced evidence regarding defendant's gun usage, testimony that Ms. Wright saw defendant pointing a gun did not render defendant's trial fundamentally unfair under either federal or state standards.

When examining Detective Bly, the prosecutor's follow-up question suggesting incarceration as a hypothetical explanation for a gang member's absence was improper. The prosecutor's question, however, did not render defendant's trial fundamentally unfair. In *People v. Bolden* (2002) 29 Cal.4th 515, a police officer witness mentioned meeting the defendant at a parole office. (*Id.* at p. 554.) The prosecutor interrupted and clarified that he sought a physical address, not a description of the meeting place. We affirmed the trial court's denial of

defendant's motion for a mistrial, noting that it was "doubtful that any reasonable juror would infer from the fleeting reference to a parole office" that defendant had a prior conviction, and that the incident was not significant in the context of the entire guilt trial. (*Id* at p. 555.) In the present case, the prosecutor's brief, hypothetical reference to incarceration was not significant given the overwhelming evidence presented against defendant during the trial. (See also *People v. Rolon* (1967) 66 Cal.2d 690, 693 ["[a]n improper reference to a prior conviction may be grounds for reversal in itself [citations] but is nonprejudicial 'in the light of a record which points convincingly to guilt' "].) It is not reasonably probable that the jury would have reached a result more favorable to defendant but for the prosecutor's question.

## C. Asserted Vouching for the Credibility of a Witness

Defendant contends the prosecutor improperly vouched for the credibility of a witness when he elicited testimony from victim Mario Ralph that the prosecutor had introduced Ralph to the prosecutor's own daughter. Defendant further asserts the trial court abused its discretion when it denied his subsequent motion for a mistrial.

During direct examination, the prosecutor asked Ralph, "You and I have talked about this case on several occasions; is that correct?" Ralph confirmed that they had. The prosecutor asked, "Have I ever allowed you to read the reports of any of the interviews you had with the police?" Ralph replied, "No." The prosecutor continued, "Have I ever allowed you to read your preliminary hearing, your testimony at the preliminary hearing? After Ralph said no, the prosecutor said, "But you and I have talked about the case?" Ralph said, "Yes, we have."

Defense counsel followed up on that line of questioning during cross-examination. Counsel confirmed that Ralph had not read any reports or the preliminary hearing transcript, and then counsel asked Ralph approximately how many times he had talked with the prosecutor. Ralph said they spoke every time he went to court. Defense counsel asked if they ever discussed Ralph's testimony. When Ralph said no, defense counsel asked what they did talk about. Ralph explained, "Mainly how I was doing. And sometimes I asked him certain things on, you know, what's going on. And I guess like sometimes I told him that I don't want to be here involved with this. I wished at the last testimony I told ya'll, the last courtroom, ya'll could have taken that and let me live my life. I don't want to be doing this." Defense counsel asked Ralph if he remembered testifying at the preliminary hearing when the prosecutor "stopped the testimony, carried you out and talked to you and brought you back and put you back on the stand; did that happen?" Ralph confirmed that it did.

On redirect examination, the prosecutor revisited the subject. He asked Ralph, "Now you were asked a number of questions about a conversation or some questions about conversations that we have had. You have come to court a number of times; is that correct?" Ralph answered affirmatively, and he also confirmed that he had testified twice before: at the preliminary hearing and also in trial the previous day. The prosecutor asked, "Now each time the case has been set, either in Pomona or before this judge or other judges in this building, you have come to court and the judge would tell you what day you would have to return; is that correct?" Ralph replied, "Yes." The prosecutor said, "And I would be there on those occasions; is that correct?" Ralph replied, "Yes." The

prosecutor continued, "And we would have general conversations?" After Ralph confirmed, the prosecutor said, "I asked you about your health?" Ralph said yes. The prosecutor continued, "How work is going, things like that?" Ralph again said yes. The prosecutor said, "On one occasion did I introduce you to my daughter?" Ralph replied, "Yes, you did."

Defense counsel asked for a sidebar and moved for a mistrial. He argued, "I think the District Attorney's misconduct, turning this into a personal matter between him, his personal relationship between him and this witness I think is totally improper." The court denied the motion, ruling, "The questions on cross-examination went to the area of conversations between the prosecutor and the witness. He is entitled to go into what the conversations were, whether they were innocent or whether they directed the witness to testify in a certain way." Defense counsel argued, "I'm having real difficulty what kind of relevancy his introduction of this particular witness has to do with anything other than trying to bolster this witness' credibility by showing he would go so far as to introduce him to his family members." The court agreed that "in and of itself, that would be improper, but it's an overlap area, and I think he is entitled to, on his effort to rehabilitate the witness, to go into every area that they discussed. Otherwise the area, it's open for, you know, any type of inference by the jury. So the objection is overruled."

"A prosecutor is prohibited from vouching for the credibility of witnesses or otherwise bolstering the veracity of their testimony by referring to evidence outside the record." (*People v. Frye* (1998) 18 Cal.4th 894, 971.) Similarly, " '[i]mpermissible "vouching" may occur where the prosecutor places the prestige of the government behind a witness through

personal assurances of the witness's veracity or suggests that information not presented to the jury supports the witness's testimony.' " (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1329.) "However, so long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the 'facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief,' [the prosecutor's] comments cannot be characterized as improper vouching." (*Frye, supra,* at p. 971.)

"A court should grant a mistrial ' "only when a party's chances of receiving a fair trial have been irreparably damaged." ' [Citation.] This generally occurs when ' " ' "the court is apprised of prejudice that it judges incurable by admonition or instruction." ' " ' [Citation.] We review the trial court's refusal to grant a mistrial for abuse of discretion." (*People v. Johnson*, *supra*, 6 Cal.5th at p. 581.)

The trial court did not abuse its discretion when it denied defendant's motion for a mistrial. Importantly, defendant cannot establish prejudice. The jury heard evidence that Ralph was a drug dealer who associated with gang members and that he attempted to destroy evidence by flushing drugs down the toilet and hiding Curtis's gun. The jury also heard that Ralph failed to tell investigating officers about the drugs or that he fired Curtis's gun before trying to hide it.

It is not reasonably likely that the jury was unduly influenced concerning Ralph's credibility by the prosecutor's comment. (See *People v. Medina* (1995) 11 Cal.4th 694, 758.) Because the elicited testimony was not prejudicial, the trial court did not err when it denied defendant's motion for a mistrial based on that brief question and Ralph's response.

## D. Asserted Erroneous Admission of Evidence

Defendant contends the admission of assertedly irrelevant testimony about negative fingerprint evidence bolstered the prosecution's case and denied him a fair trial.

As the final witness in its case in chief, the prosecution called Peter Kergil, a forensic specialist employed by the Los Angeles County Sheriff's Department. Kergil explained that his expertise was fingerprint identification. After Kergil testified that he had conducted no forensic work on the case, nor was he aware of any facts concerning the case, defense counsel objected to his testimony on relevancy grounds. Counsel argued, "This witness has testified he did no work at all on this case. And I don't know if there has been any fingerprint evidence. There has been nothing introduced in regard to fingerprint evidence in this case, and I would ask that his testimony be excluded." The prosecutor responded that he calls a "negative fingerprint expert" on every case he tries. He explained that jurors watch a lot of crime shows and see fingerprints lifted off every surface "all the time," but Kergil would explain that usable fingerprints are found on a firearm only rarely, in approximately eight to ten percent of cases. The prosecutor continued, "The first thing that will happen when they go back to jury deliberation, Judge, is the jurors will start talking about fingerprint evidence. Even though neither one of us mentioned the word, we did get into [gunshot residue] the other day, and they will say, 'If [defendant] was in that apartment, they would have put evidence on [that] his fingerprints were on the gun.' That is my experience in trying cases."

The trial court overruled the objection, commenting: "The People are required to prove [their case] beyond a reasonable

doubt. And if they want to shut down any doors of concern by the jurors, I think that is fine. Also, it seems to me, that if anybody is going to argue fingerprints, that this gives them a basis in fact to do that."

Kergil initially testified that as a general matter he can recover a fingerprint from items or surfaces approximately 30 percent of the time when he examines such evidence. He explained that there are several reasons why someone's fingerprint might not be left on a surface after touching it. The prosecutor asked, "Now, a firearm, for example, again, we watch TV. We always see a firearm is collected in evidence, and it is immediately taken to a lab, and somebody lifts a print off the firearm, and that print is able to be identified to the person that committed the crime." The prosecutor asked Kergil how often an expert is able to lift a fingerprint from a firearm, to which Kergil replied approximately 8 to 10 percent.

Only relevant evidence is admissible. (Evid. Code, § 350.) Evidence is relevant if it has a "tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) "The trial court has broad discretion to determine the relevance of evidence [citation], and we will not disturb the court's exercise of that discretion unless it acted in an arbitrary, capricious or patently absurd manner [citation]." (*People v. Jones* (2013) 57 Cal.4th 899, 947.)

Defendant contends the testimony about the absence of fingerprint evidence in this case was irrelevant because it did not address a disputed fact. He argues that the absence of fingerprints was not an issue before the jury. Defendant also argues the admission of irrelevant evidence violated his rights

to due process and rendered his trial fundamentally unfair. We are not persuaded.

In *United States v. Feldman* (9th Cir. 1986) 788 F.2d 544, the federal appellate court held that testimony regarding the absence of fingerprint evidence on direct examination was proper. (*Id.* at pp. 554–555.) The court noted that it was "standard and proper litigation technique" to anticipate the opposing party's argument and forestall it with one's own presentation. (*Id.* at p. 555; see also *United States v. Christophe* (9th Cir. 1987) 833 F.2d 1296, 1300 [trial court did not abuse its discretion in permitting FBI agent to testify regarding the lack of fingerprint evidence].) The fact that the defense had not yet raised the issue of the absence of fingerprints, therefore, did not preclude the prosecution from introducing Kergil's testimony.

Further, defendant fails to show prejudice from admission of the evidence. Despite defendant's claim to the contrary, the testimony did not encourage the jury to speculate that there was fingerprint evidence connecting defendant to the crime scene that the jury did not hear. The trial court did not abuse its discretion in admitting testimony about the absence of fingerprint evidence in this case. Because the trial court did not abuse its discretion, admission of the evidence did not violate defendant's right to due process, nor did it render his trial fundamentally unfair. (See *People v. Partida* (2005) 37 Cal.4th 428, 439 [erroneous admission of evidence "results in a due process violation only if it makes the trial *fundamentally unfair*"].)

## E. Asserted Instructional Errors

Defendant raises several allegations of instructional error. We find no merit in his contentions.

### 1. *Circumstantial Evidence*

Defendant asserts the trial court erred when instructing the jury regarding circumstantial evidence.

In the course of discussing jury instructions with counsel, the trial court raised questions about the issue of circumstantial evidence. The court noted that it had formerly instructed juries by using both CALJIC No. 2.01, "Sufficiency of Circumstantial Evidence — Generally," *and* CALJIC No. 2.02, "Sufficiency of Circumstantial Evidence to Prove Specific Intent or Mental State." The court observed that recent case law clarified it was error to instruct with both, and that a court should give one or the other. The court explained that it had tentatively included CALJIC No. 2.01 in the instruction packet because "there was quite a bit of circumstantial evidence. Specifically the gun, the recovery of the gun and the bullets that were found at various locations and in the decedent's body, according to the expert, matching the gun that it was fired from. That and also assuming that they accept Mr. Priest's testimony, essentially he said he saw, he heard the defendant. And from that, circumstantially, he decided that it was defendant, although he glimpsed something from the back of the sides. All that I think is circumstantial evidence, but I'm open to argument."

Defense counsel agreed with the trial court, expressing a preference for using CALJIC No. 2.01. The prosecutor explained that he did not believe the case rested substantially on circumstantial evidence. He argued that the matter was "basically an eyewitness identification case," and asserted that CALJIC No. 2.01 would conflict with CALJIC No. 2.91 concerning eyewitness identification. He agreed that the firearm evidence was an important part of the prosecution's case

but noted that "if we rely just on the firearm evidence alone without the identification, the court probably wouldn't let it go to the jury." The trial court said it was "on the fence" and was trying to determine whether the circumstantial evidence was incidental to, or corroborative of, the direct evidence.

After considering the matter, the trial court explained, "I do believe that the circumstantial evidence is tangential or corroborative. The main thrust of all of this is really whether they can believe the witnesses, eyewitness testimony. And I do agree with the argument. I hadn't thought of it before that it seems somewhat inconsistent with the eyewitness identification instruction." The court stated that on reflection it would instruct the jury not with CALJIC No. 2.01, but with CALJIC No. 2.02.[3]

---

[3] The trial court instructed the jury with a modified version of CALJIC No. 2.02, as follows (the modified portion is italicized): "The specific intent or mental state with which an act is done may be shown by the circumstances surrounding the commission of the act. *However, a finding of guilt as to any crime or special circumstance or special allegation may not be based on circumstantial evidence* unless the proved circumstances are not only (1) consistent with the theory that the defendant had the required specific intent or mental state but (2) cannot be reconciled with any other rational conclusion. Also, if the evidence as to any specific intent or mental state permits two reasonable interpretations, one of which points to the existence of the specific intent or mental state and the other to its absence, you must adopt that interpretation which points to its absence. If, on the other hand, one interpretation of the evidence as to the specific intent or mental state appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable." The unmodified version read:

Defendant asserts CALJIC No. 2.01 was appropriate and necessary because the evidence concerning counts 1 (attempted murder of Martin), 3 (attempted murder of Priest), 5 (attempted murder of Alexander), and 6 (murder of Curtis) was primarily circumstantial.

"CALJIC No. 2.02 was designed to be used in place of CALJIC No. 2.01 when the defendant's specific intent or mental state is the only element of the offense that rests substantially or entirely on circumstantial evidence." (*People v. Honig* (1996) 48 Cal.App.4th 289, 341.) "It should not be given where the evidence is either direct or, if circumstantial, is not equally consistent with a conclusion of innocence." (*Ibid.*)

"An instruction on the principles contained in CALJIC No. 2.01 'must be given sua sponte when the prosecution substantially relies on circumstantial evidence to prove guilt." (*People v. Rogers* (2006) 39 Cal.4th 826, 885 (*Rogers*).) The instruction should not be given "simply because the incriminating evidence is indirect . . . but is appropriate only when 'guilt must be inferred from a pattern of incriminating circumstances.' " (*People v. Heishman* (1988) 45 Cal.3d 147, 167.) A trial court need not give the instruction "when circumstantial evidence is merely incidental to and corroborative of direct evidence, due to the 'danger of misleading and confusing the jury where the inculpatory evidence consists wholly or largely of direct evidence of the crime.' " (*People v. McKinnon* (2011) 52 Cal.4th 610, 676 (*McKinnon*).)

---

"However, you may not find the defendant guilty of the crime charged [in Count[s] . . . and], [or] [the crime[s] of . . . which [is a] [are] lesser crime[s]],] [or] [find the allegation to be true,] unless . . . ."

As the prosecution argued, its case rested primarily on the eyewitness testimony from Martin, Priest, and Ralph. Priest identified defendant as the person he heard speaking just before hearing gunshots fired from defendant's location and subsequently finding Martin shot. After he heard the gunshots, Priest looked over and recognized defendant's profile as defendant walked out of the apartment. Martin testified that defendant was the person who pulled out a gun, ordered him to lie on the floor, and then shot him. He further identified defendant as the man who stabbed Priest in the back. Ralph identified defendant as the individual who shot Alexander and Curtis. He had heard defendant's voice prior to hearing gunshots coming from defendant's location, and after the shooting, he saw defendant holding a gun.

Although he testified for the defense and disavowed his previous identifications, Alexander admitted on cross-examination that he had identified defendant as the shooter during a live lineup. At the hospital, he told a detective that he saw the man who shot him, Curtis, and Ralph, and he had seen a photo of that person in a newspaper and on television. Alexander identified defendant as the shooter in a photo lineup.

In addition to testimony by the eyewitnesses, the prosecution presented circumstantial evidence in the form of ballistics evidence. A criminalist with the Sheriff's department testified that the bullets recovered at both scenes and from Curtis's body were fired from the gun found in defendant's possession.

In *Rogers*, the defendant presented an argument similar to defendant's here. The trial court instructed the jury with CALJIC No. 2.02, rather than CALJIC No. 2.01, and we

concluded the trial court erred in doing so. (*Rogers*, *supra*, 39 Cal.4th at p. 885.) The prosecution's case regarding the identity of the assailant rested on two pieces of circumstantial evidence: the defendant's possession of the murder weapon and his admission that he killed another victim under similar circumstances. (*Ibid.*) There was no direct evidence linking the defendant to the murder and no eyewitnesses saw the defendant with the victim. We concluded the error was harmless, however, because the evidence supporting the jury's guilt determination was strong. (*Id.* at p. 886.) Unlike *Rogers*, which lacked direct evidence, several eyewitnesses in the present case placed defendant at both the Long Beach scene and the Pomona scene. The jury also heard ballistics evidence linking defendant to the murder which bolstered the direct evidence presented. Although none of the eyewitnesses testified that they saw defendant pull the trigger of the gun that shot Alexander, Martin, and Curtis, Alexander did tell a detective that he saw the man who shot them and identified defendant as that person. At trial, Martin and Priest identified defendant as the sole perpetrator, placed him at the scene with a handgun, and described a robbery during which the three victims were shot.

In *McKinnon*, the prosecution's case rested on testimony from a witness that the defendant confessed to shooting the victim in the head. (*McKinnon, supra*, 52 Cal.4th at p. 676.) The circumstantial evidence presented related to defendant's possession of the murder weapon one week after the crime. We upheld the trial court's decision not to instruct with CALJIC No. 2.01, noting that while the incriminating effect of the circumstantial evidence "was indeed substantial, it complemented, and was merely corroborative of, defendant's admissions." (*Id.* at p. 676.) As discussed, here, defendant's

guilt was established primarily by direct witness testimony. Any circumstantial evidence was corroborative of the eyewitness testimony. Because the prosecution presented to the jury ample direct evidence of defendant's identity, the trial court did not err when it instructed the jury with CALJIC No. 2.02.

### 2. *Witness Identification*

Defendant contends the trial court erroneously instructed the jury regarding the reliability of eyewitness identification, violating his right to due process.

The trial court instructed the jury with CALJIC No. 2.92 regarding factors to consider in proving identity by eyewitness testimony. By this, the jury was directed to "consider the believability of the eyewitness as well as other factors which bear upon the accuracy of the witness' identification," including "[t]he extent to which the witness is either certain or uncertain of the identification." Defendant asserts that a witness's certainty of his identification is irrelevant and does not indicate eyewitness reliability, and it was error for the jury to consider that as a factor.

We recently addressed a jury instruction regarding an eyewitness's level of certainty in *People v. Lemcke* (2021) 11 Cal.5th 644 (*Lemcke*). In *Lemcke*, the defendant and his girlfriend attacked a woman at a motel. (*Id.* at p. 648.) The victim identified the defendant in a photographic lineup later that day, and again approximately three months later. (*Id.* at pp. 648–649.) The defense called an expert witness who testified at length regarding the reliability of eyewitness identifications. (*Id.* at 650–652.) The trial court instructed the jury with CALCRIM No. 315, providing 15 factors the jury should consider when evaluating the credibility and accuracy of

eyewitness identification evidence. (*Id.* at 652.) On appeal, the defendant argued that the certainty instruction violated his due process rights to a fair trial.

Although *Lemcke* concerned a challenge to CALCRIM No. 315, we noted that CALJIC No. 2.92 is similarly worded and found no material distinction between the two instructions. (*Lemcke, supra,* 11 Cal.5th at p. 656, fn. 6.) We acknowledged research that has found eyewitness confidence to be an unreliable indicator of accuracy and referred to the Judicial Council and its Advisory Committee on Criminal Jury Instructions an evaluation of "whether or how the instruction might be modified to avoid juror confusion regarding the correlation between certainty and accuracy." (*Id.* at p. 647.) We held, however, that the instruction did not violate the defendant's due process rights. (*Id.* at 661.) We observed that the defense expert witness had testified that certainty is generally not predictive of accuracy, and defense counsel had cross-examined the victim and the investigating officers regarding her identifications and the procedures used. (*Id.* at p. 660.)

Although the defense below did not present an eyewitness identification expert as had occurred in *Lemcke*, defendant's primary trial strategy was to discredit Ralph, Priest, and Martin, and to imply that the eyewitnesses were testifying falsely. At no point did defendant argue that the witnesses mistook his identity. This was in contrast to *Lemcke*, where the defense strategy focused on questioning the victim's identification of the defendant. (*Lemcke, supra,* 11 Cal.5th at pp. 652–653.) The instant case involved the identification of defendant by multiple witnesses, and, unlike in *Lemcke*, at least

two of the witnesses had known defendant in some capacity prior to the attack.

Further, here the trial court's instructions as a whole properly instructed the jury how to evaluate the evidence presented. The court also instructed the jury with CALJIC No. 2.20 concerning the believability of a witness and CALJIC No. 2.21.2 concerning a witness who is willfully false. When considered " 'in the context of the instructions as a whole and the trial record' " (*People v. Foster* (2010) 50 Cal.4th 1301, 1335, italics omitted), the trial court's use of CALJIC No. 2.92 did not violate defendant's due process rights.

### 3. *Felony Murder*

Defendant contends the court erroneously instructed the jury on felony murder and first degree murder in light of the fact that the information charged him with only second degree murder under section 187.

The amended information charged defendant in count 6 with murder as follows: "On or about March 21, 2000, in the County of Los Angeles, the crime of murder, in violation of Penal Code section 187(a), a Felony, was committed by William Lee Wright, Jr., who did unlawfully and with malice aforethought, murder Phillip Curtis, a human being." Count 6 further alleged that defendant committed the murder while engaged in the commission of the crimes of robbery and burglary within the meaning of section 190.2, subdivision (a)(17).

The trial court instructed the jury on felony murder with CALJIC No. 8.21 as follows: "The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs during the commission or attempted commission of the crime of robbery or burglary is murder of the first degree when

the perpetrator had the specific intent to commit that crime. The specific intent to commit robbery or burglary and the commission or attempted commission of such crime must be proved beyond a reasonable doubt."

The trial court properly instructed the jury on first degree murder. We have previously held that "in instructing a jury on first degree murder when the information charged malice murder under section 187, a trial court does not violate a defendant's federal constitutional rights to due process, notice, proof beyond a reasonable doubt, or a unanimous verdict." (*People v. Carey* (2007) 41 Cal.4th 109, 132.) The information charged defendant with a robbery and burglary special circumstance, sufficiently putting defendant on notice that the prosecution was proceeding on a felony-murder theory. (See *ibid.*)

Defendant further argues that because the information charged only second degree murder, the trial court lacked jurisdiction to try him for first degree murder. We have repeatedly rejected this jurisdictional argument. (*People v. Lopez* (2018) 5 Cal.5th 339, 360 (*Lopez*); *People v. Hughes* (2002) 27 Cal.4th 287, 369; *People v. Silva* (2001) 25 Cal.4th 345, 367; *People v. Carpenter* (1997) 15 Cal.4th 312, 394–395.) Defendant offers no persuasive reason for us to revisit these holdings.

### 4. *Proof Beyond a Reasonable Doubt*

Defendant contends several guilt phase instructions undermined the requirement of proof beyond a reasonable doubt.

As observed earlier, the trial court instructed the jury by using a modified version of CALJIC No. 2.02 that discussed the relationship between the reasonable doubt requirement and

circumstantial evidence. (See *ante*, fn. 9.) As relevant here, the instruction provided that if "one interpretation of the evidence as to the specific intent or mental state appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable." Defendant contends the instruction "informed the jurors that if appellant reasonably appeared to be guilty, they could find him guilty — even if they entertained a reasonable doubt as to guilt." We have previously rejected defendant's contention, holding that such a direction "is entirely consistent with the rule of proof beyond a reasonable doubt, because an *unreasonable* inference pointing to innocence is, by definition, not grounds for a *reasonable* doubt. The circumstantial evidence instructions are thus correct." (*People v. Brasure* (2008) 42 Cal.4th 1037, 1058.) We need not revisit this conclusion now.

Defendant next claims that four additional instructions individually and collectively conflicted with the reasonable doubt standard: CALJIC Nos. 2.21.1 (Discrepancies in Testimony); 2.21.2 (Witness Willfully False); 2.22 (Weighing Conflicting Testimony); and 2.27 (Sufficiency of Testimony of One Witness). He asserts these instructions "urged the jury to decide material issues by determining which side had presented relatively stronger evidence," thus replacing the reasonable doubt standard with the preponderance of the evidence standard. As defendant concedes, we have previously rejected his contention. (See *People v. Whalen* (2013) 56 Cal.4th 1, 70; *People v. Tate* (2010) 49 Cal.4th 635, 697–698.) Defendant provides no persuasive reason to revisit our prior holdings.

### F. Challenges to the Death Penalty Law

Defendant presents several challenges to California's death penalty law that our prior decisions have considered and rejected. He provides no basis necessitating us to reexamine the following conclusions:

"California's death penalty law 'adequately narrows the class of murderers subject to the death penalty' and does not violate the Eighth Amendment. [Citation.] Section 190.2, which sets forth the circumstances in which the penalty of death may be imposed, is not impermissibly broad in violation of the Eighth Amendment." (*People v. Williams* (2013) 58 Cal.4th 197, 294.)

The death penalty statute "is not invalid for failing to require (1) written findings or unanimity as to aggravating factors, (2) proof of all aggravating factors beyond a reasonable doubt, (3) findings that aggravation outweighs mitigation beyond a reasonable doubt, or (4) findings that death is the appropriate penalty beyond a reasonable doubt." (*People v. Snow* (2003) 30 Cal.4th 43, 126, fn. omitted (*Snow*).) These conclusions are not altered by the United States Supreme Court's decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466, or *Ring v. Arizona* (2002) 536 U.S. 584. (*People v. Simon* (2016) 1 Cal.5th 98, 149.) The high court's decision in *Hurst v. Florida* (2016) 577 U.S. 92, which invalidated Florida's capital sentencing scheme, does not invalidate California's law because our sentencing scheme is " 'materially different from that in Florida.' " (*People v. Becerrada* (2016) 2 Cal.5th 1009, 1038; see also *People v. Rangel* (2016) 62 Cal.4th 1192, 1235, fn. 16.)

"Allowing the jury to consider the circumstances of the crime (§ 190.3, factor (a)) does not lead to the imposition of the

death penalty in an arbitrary or capricious manner." (*People v. Kennedy* (2005) 36 Cal.4th 595, 641.)

"CALJIC No. 8.88's use of the words 'so substantial,' its use of the word 'warrants' instead of 'appropriate,' its failure to instruct the jury that a sentence of life is mandatory if mitigation outweighs aggravation, and its failure to instruct the jury on a 'presumption of life' does not render the instruction invalid." (*People v. Rountree* (2013) 56 Cal.4th 823, 862–863.)

The death penalty statutory scheme is not invalid for failing to require written findings. (*Lopez*, *supra*, 5 Cal.5th at p. 370.)

A trial court "need not and should not instruct the jury as to any burden of proof or persuasion at the penalty phase." (*People v. Blair* (2005) 36 Cal.4th 686, 753.)

"The trial court has no obligation to delete from CALJIC No. 8.85 inapplicable mitigating factors, nor must it identify which factors are aggravating and which are mitigating." (*People v. Cook* (2006) 39 Cal.4th 566, 618.)

"The adjectives 'extreme' and 'substantial' in statutory mitigating factors (d) and (g) of section 190.3 do not prevent the jury from considering mitigating evidence." (*People v. Leonard* (2007) 40 Cal.4th 1370, 1429 (*Leonard*).)

"The trial court is not required to instruct the jury that statutory factors (d), (e), (f), (g), (h), and (j) in section 190.3 are relevant only as mitigating factors, not as aggravating factors." (*Leonard*, at p. 1430.)

"Comparative intercase proportionality review by the trial or appellate courts is not constitutionally required." (*Snow*, *supra*, 30 Cal.4th at p. 126.)

"The capital sentencing scheme does not violate equal protection by denying to capital defendants procedural safeguards that are available to noncapital defendants." (*People v. Thomas* (2012) 53 Cal.4th 771, 836 (*Thomas*).)

California's death penalty does not violate international law or international norms of decency. (*Thomas*, *supra*, 53 Cal.4th at p. 837.)

## G. Cumulative Error

Defendant contends reversal is warranted because of the cumulatively prejudicial effect of the guilt and penalty phase errors. We have found one error and assumed one more, both in connection with defendant's claim of prosecutorial misconduct. Even aggregated, these errors are harmless under any standard.

## III. CONCLUSION

The judgment is affirmed.

**CANTIL-SAKAUYE, C. J.**

**We Concur:**

**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**
**LUI, J.**[*]

---

[*] Administrative Presiding Justice of the Court of Appeal, Second Appellate District, Division Two, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Wright

_____

<u>**Procedural Posture**</u> (see XX below)
**Original Appeal** XX
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S107900
**Date Filed:**  December 16, 2021

_____

**Court:**  Superior
**County:**  Los Angeles
**Judge:**  Norman P. Tarle

_____

**Counsel:**

Michael J. Hersek and Mary K. McComb, State Public Defenders, under appointments by the Supreme Court, Kathleen M. Scheidel and Alison Bernstein, Assistant State Public Defenders, and Alyssa Mellott, Deputy State Public Defender, for Defendant and Appellant.

Kamala D. Harris, Xavier Becerra and Rob Bonta, Attorneys General, Dane R. Gillette and Lance E. Winters, Chief Assistant Attorneys General, James William Bilderback II, Assistant Attorney General, Jaime L. Fuster and Kim Aarons, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Alyssa Mellott
Deputy State Public Defender
1111 Broadway, 10th Floor
Oakland, CA 94607
(510) 267-3300

Kim Aarons
Deputy Attorney General
300 S. Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 269-6092